The SCOTT FETZER COMPANY d/b/a The Kirby Company, Appellant,

v.

Dena Kristi READ, Appellee.

No. 03–95–00544–CV.

Court of Appeals of Texas, Austin.

May 1, 1997.

Rehearing Overruled June 19, 1997.

---

2. The State concedes in its brief that the general venue statute governs.

James Lawrence Wright, Mithoff & Jacks, L.L.P., Austin, for Appellee.

Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

JONES, Justice.

The Scott Fetzer Company, doing business as The Kirby Company ("Kirby"), appellant, appeals from a judgment awarding actual and exemplary damages to appellee, Dena Kristi Read, after she was sexually assaulted in her home by a Kirby dealer. In eight points of error, Kirby argues that the evidence is legally and factually insufficient to support jury findings (1) that Kirby breached any duty to Read; (2) that Kirby proximately caused Read's injuries; (3) that Kirby acted with gross negligence; and (4) awarding Read exemplary damages. We will affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Kirby manufactures vacuum cleaners and sells them through a marketing system of in-home demonstrations performed by door-to-door salespersons. Kirby vacuums are multi-task appliances that retail for approximately $1,200–$1,300. Kirby has found that the most effective way to sell its products is through in-home demonstrations. As a result, Kirby eschews direct sales to the public and sells its products only to independent "distributors." The relationship between Kirby and each of its distributors is governed by a uniform Distributor Agreement, which proclaims that the distributors act as independent contractors in performing their duties under the contract. As part of their obligations to Kirby under the Distributor Agreement, the distributors are required to sell Kirby products exclusively through in-home demonstrations. Kirby would consider a violation of this provision a material breach of the Distributor Agreement. To promote this facet of the agreement, each distributor is required to build an in-home sales force by recruiting prospective door-to-door salespeople called "dealers."[1] Though it requires in-

David A. Kutik, Jones, Day, Reavis & Pogue, Cleveland, OH, for Appellant.

---

1. In order to satisfy their contractual obligations to Kirby, distributors' agreements with their dealers also specify how sales are to be conduct-

ed. The third and fourth paragraphs of the "Kirby Independent Dealer Agreement" state:

home sales, Kirby does not require its distributors to conduct background checks on prospective dealers.

In 1992, Leonard Sena, a long-time Kirby distributor, hired Mickey Carter to be a dealer. On his application, Carter listed three prior places of employment and three personal references. Sena did not call Carter's references or prior employers. In fact, Sena did nothing to check Carter's background or any of the information on his application. If Sena had contacted Carter's prior employers, he would have discovered that women who had worked with Carter at those jobs had complained that he engaged in inappropriate sexual conversations and made unwanted obscene telephone calls. In addition, at the time he applied to sell Kirby vacuums door-to-door, Carter had been arrested and had received deferred adjudication for an incident in which he exposed himself to two young girls. One of the previous employers listed on Carter's application had fired him because of that indecent-exposure incident. Carter's employment records with that company contained a copy of the confession Carter gave to the police when he was arrested. The confession stated:

First I want you to know I have a problem. I need help. I was in [a] psychiatric ward when I was in the Army. I have this thing in my mind that controls me at times. I can't help what I do. Like I go outside naked. I expose myself. I do things that I do not have control of.... I know I need help. I want someone to help me. I need the help before the devil controls me. Please, have them get me help.

The employment records also contained witness statements, Carter's guilty plea, and the indictment charging him with the offense.

They also document another incident in which Carter was discovered masturbating in front of a woman at his apartment complex.

One of the personal references listed on Carter's application was David Bruchs, who worked with Carter's wife at a Seguin bank. Bruchs knew that Carter had exposed himself to two young girls at his apartment complex and was on probation. Bruchs also had information that Carter and his wife had been evicted from various apartments because of Carter's sexually inappropriate conduct. He also knew of a specific incident when Carter "flashed" another female bank employee. Sena never discovered this information, however, because he did not call Bruchs. Thus, in spite of Carter's sordid history, he was hired to sell Kirby vacuums to unsuspecting homemakers in the privacy of their homes.

In March 1993, after having been allowed into Read's home to perform a Kirby demonstration, Carter sexually assaulted Read while her children were taking an afternoon nap. Read and her husband sued Kirby, Sena, and Carter.[2] The claims against Carter were non-suited prior to trial. The Reads' case was submitted to the jury under a "broad form" negligence question asking the jury to determine the comparative negligence of Kirby, Sena, and Kristi Read. Because the trial court had granted Sena's motion for a bifurcated trial on exemplary damages, questions on exemplary damages were withheld subject to a finding of gross negligence. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 29–30 (Tex.1994). The jury found Sena and Read each ten percent negligent and Kirby eighty percent negligent. The jury also found Kirby grossly negligent. With regard to damages, the

3. Dealer fully understands that in order to protect and maintain The Kirby Company's trade name, reputation, and competitiveness in the marketplace, Kirby Systems must be sold exclusively to consumer end-users by in-home demonstration.

4. Dealer certifies and agrees that any Kirby system consigned to dealer will only be sold to consumer end-users after a personal demonstration which will be conducted in the home of the personal end-user. Dealer understands that any other type of resale of Kirby Systems to wholesalers, retailers, or to anyone who is purchasing the product for the purpose of resale as opposed to consumer end-use, will constitute a breach of this Agreement and that Dealer's right to sell Kirby Systems will be terminated immediately.

2. The Reads also sued William Boruta, another Kirby distributor who lived closer to where Carter worked and to whom Carter's dealer contract had been assigned by Sena. Boruta died during trial, however, and the Reads' claims against him were severed.

jury found that Kristi Read had suffered $1,500,000 in actual damages, but that her husband had no monetary damages.

Due to the finding of gross negligence against Kirby, the trial court began the exemplary-damages phase of the trial. During their deliberations in this second phase, the jurors indicated that they had reached an impasse. The jury sent out a note stating that some of the jurors felt exemplary damages were included in the actual damages found in the trial's first phase. Outside the jurors' presence, counsel for all parties expressed concern at the jury's deadlock. The trial court noted that the jury had not been discharged, the verdict from the first phase had not been formally accepted, and no new evidence had been presented in the second phase that could prejudice the jury. The court proposed to counsel a procedure by which it would instruct the jury that, if they were not satisfied that they had followed the instructions in the first-phase charge, they could deliberate further on both actual and exemplary damages simultaneously. Both the Reads' and Sena's counsel expressed their satisfaction with that instruction, and the trial court subsequently gave it to the jury.

After further deliberation, the jury returned a new damages verdict: $200,000 in actual damages and $1,500,000 in exemplary damages. The Reads' counsel then objected for the first time to the court's new instruction and requested an additional period of reargument. The court denied this request and accepted the jury's verdict. Pursuant to former section 41.007 of the Civil Practice and Remedies Code, which limited exemplary damages to four times the amount of actual damages, the trial court reduced the exemplary damages award to $800,000.[3] Judgment was ultimately rendered against Kirby for $160,000 in actual damages and $800,000 in exemplary damages, plus prejudgment and postjudgment interest and costs. On appeal,

Kirby claims it owed Read no duty and that the evidence is legally and factually insufficient to show that Kirby proximately caused Read's damages and to support the award of exemplary damages. In a cross-point, Read argues the trial court erred by failing to render judgment on the jury's first determination of actual damages. We will affirm the award of actual damages and reverse the award of exemplary damages.

## DISCUSSION

### The Duty Owed to Kristi Read

Read's cause of action rests on negligence and gross negligence on the part of Kirby. The common-law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from that breach. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975). The threshold inquiry in a negligence case is whether a duty exists. *El Chico Corp.,* 732 S.W.2d at 311. In its first two points of error, Kirby asserts that, because Sena and Carter were independent contractors, it owed no legal duty to Read. We disagree.

### (i) *Duty Arising from Knowledge of a Peculiar Risk*

■ Whether the defendant owes a legal duty to the plaintiff is a question of law. *Mitchell v. Missouri–K.–T. R.R.,* 786 S.W.2d 659, 662 (Tex.1990). The general rule is that an employer or owner is not liable for the acts or omissions of its independent contractors. *See Abalos v. Oil Dev. Co.,* 544 S.W.2d 627, 631 (Tex.1976); *American Nat'l Ins. Co. v. Denke,* 128 Tex. 229, 95 S.W.2d 370, 373 (Comm.App.1936). Texas courts, however, have recognized many exceptions to this general rule of non-liability.[4] Both the rule and

---

3. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 46 (Tex. Civ. Prac. & Rem.Code Ann. § 41.007, since amended and renumbered as Tex. Civ. Prac. & Rem.Code Ann. § 41.008 (West Supp.1997)).

4. *See, e.g., Redinger v. Living, Inc.,* 689 S.W.2d 415 (Tex.1985) (employer of independent con-

tractor is liable if it retains a right of control over contractor's work and fails to use reasonable care in exercising that control); *Loyd v. Herrington,* 143 Tex. 135, 182 S.W.2d 1003 (1944) (employer of independent contractor has non-delegable duty to ensure that inherently dangerous work is performed safely); *Jones v. Southwestern*

its exceptions are derived from the same underlying polices. The general rule encompasses the notion that employers should not be held responsible for activities they do not control and, in many instances, lack the knowledge and resources to direct. *See* Restatement (Second) of Torts [hereinafter "Restatement"] § 409, cmt. b (1965). The exceptions largely reflect special situations where the employer is in the best position to identify, minimize, and administer the risks involved in the contractor's activities. *See* W. Prosser & W.P. Keeton, *Prosser and Keeton on the Law of Torts* § 71, at 509–10 (5th ed. 1983); Fowler V. Harper, *The Basis of the Immunity of an Employer of an Independent Contractor,* 10 Ind. L.J. 494, 498–500 (1935); *see also* Restatement §§ 410–429 (1965) (listing 24 exceptions to the general rule of non-liability). One of these long-recognized exceptions is encompassed by the doctrine of "peculiar risk."

■ The peculiar-risk exception establishes liability for an employer who hires an independent contractor to do work that the employer knows is likely to create "a peculiar risk of physical harm to others" absent special precautions. The peculiar-risk exception is premised on the putative existence of a duty to third parties that the employer, for policy reasons, may not delegate to an independent contractor. Its use is traced to the leading English case of *Bower v. Peate,* 1 Q.B.D. 321 (1876), in which an independent contractor undermined the plaintiff's building by negligently failing to shore up an excavation on his employer's adjacent land. The court held the independent contractor's employer liable, finding that:

> [A] man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbours must be expected to arise unless means are adopted by which such consequences may be prevented, is bound to see to the doing of that which is necessary to prevent the mischief, and cannot relieve himself of

his responsibility by employing some one else. . . .

*Id.* at 326. The peculiar-risk exception represents an allocation of risk and prevents unscrupulous employers of independent contractors from hiding behind the drawbridge of immunity of the independent contractor's general rule of non-liability. *Cf. Byrd v. Skyline Equipment Co.,* 792 S.W.2d 195, 197 (Tex.App.—Austin 1990), *writ denied per curiam,* 808 S.W.2d 463 (Tex.1991) (party cannot "shed" a legal duty by engaging an independent contractor to do the actual work).

■ The peculiar-risk exception is exemplified by section 413 of the Restatement:

> One who employs an independent contractor to do work which the employer should recognize as likely to create a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused by the absence of such precautions if the employer:
>
> (a) fails to provide in the contract that the contractor shall take such precautions, or
>
> (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

Restatement § 413 (1965). Thus, under the peculiar-risk exception, liability may be imposed on the employer of an independent contractor if the employer has reason to know that the independent contractor's work is likely to create a peculiar risk of harm to others absent special precautions and if the employer takes no steps to minimize that risk.

■ A peculiar risk relates to special risks "peculiar to the work to be done, and arising out of its character, or *out of the place where it is to be done,* against which a reasonable [person] would recognize the necessity of taking special precautions." *Wilson v. Good Humor Corp.,* 757 F.2d 1293, 1304–05 (D.C.Cir.1985) (quoting Restatement § 413, cmt. b (1965)). "Peculiar," though, does not mean that the risk must be one that is abnor-

*Newspapers Corp.,* 694 S.W.2d 455 (Tex.App.—Amarillo 1985, no writ) (employer has duty to use ordinary care in employing an independent contractor). *See generally* Comment, *Responsi-*

*bility for the Torts of an Independent Contractor,* 39 Yale L.J. 861 (1930) (discussing the range of exceptions to the general rule of non-liability).

mal to the type of work done, or that it must be an abnormally great risk. It has reference only to a special, recognizable danger arising out of the work itself, of which special precautions can be taken to avert the risk. *Good Humor,* 757 F.2d at 1304–05.

The peculiar-risk doctrine has been applied to many situations. For example, in *Good Humor,* a child was fatally struck by a car as she responded to a Good Humor ice cream vendor who parked his truck on the street and began "ringing the distinctive Good Humor jingle bells." 757 F.2d at 1296. In holding Good Humor liable under the doctrine of peculiar risk, the court explained:

> [The evidence] was sufficient to permit a jury finding that Good Humor knew or had special reason to know of the risks to children likely to arise from the street vending of ice cream. . . .
>
> . . . .
>
> . . . The vendors do not possess any special experience or knowledge concerning the risk peculiar to their task. Good Humor, by contrast, has special and detailed knowledge of the peculiar risks to children involved in its operation and is in the best position to ensure reasonable safety awareness. Despite its concededly extensive knowledge of those risks, moreover, Good Humor has apparently *chosen* to disclaim responsibility for warning its vendors or for taking any precautions whatsoever against the known and specific

dangers to children who purchase ice cream from their vendors.

*Id.* at 1305–06.[5]

■ Kirby argues that peculiar risk is not a separate degree of dangerous activity, but is instead merely a part of the "inherently dangerous work" exception to the general rule of non-liability for acts of independent contractors. Texas case law has briefly discussed the doctrine of peculiar risk, but only in regard to section 416 of the Restatement, not section 413, and it has never been directly applied.[6] *See, e.g., Gessell v. Traweek,* 628 S.W.2d 479, 482 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.); *Gaspard v. Cox,* 583 S.W.2d 877, 879 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.). The inherent-danger and peculiar-risk exceptions are closely related because both focus on the independent-contractor relationship and the particular circumstances surrounding a specific job. Although the doctrines of peculiar risk and inherently dangerous activities are related, however, "they are not identical and ought not to be confused." *Good Humor,* 757 F.2d at 1311 n. 7 (Bork, J., concurring).

Many legal doctrines emphasize the importance of specific circumstances, but it does not follow that they all embrace the same fundamental principles. The difference between the doctrines of peculiar risk and inherently dangerous work is that peculiar risk occupies an intermediate position between the employer's absolute *immunity* for an independent contractor's negligence in ordi-

---

**5.** *See also Luedtke v. Arizona Family Restaurants, Inc.,* 160 Ariz. 500, 774 P.2d 804 (1989). In *Luedtke* a mother brought suit for the wrongful death of her six-year-old son who was killed after patronizing an ice cream truck owned and operated by an independent contractor. The trial court granted the employer's motion for directed verdict on the issue of the employer's independent liability under the peculiar-risk doctrine. On appeal, the plaintiff relied on *Good Humor.* The intermediate court affirmed, distinguishing *Good Humor* on its facts. *See Luedtke v. Arizona Family Restaurants, Inc.,* 158 Ariz. 442, 763 P.2d 262, 264–65 (Ct.App.1988). The Arizona Supreme Court granted the plaintiff's petition for review, but the parties settled all issues before the court had ruled on the merits. Consequently, the court dismissed the appeal. In doing so, however, the court exercised its discretion and vacated the part of the court of appeals' opinion dealing with the potential liability of employers

of independent contractors. *See Luedtke,* 774 P.2d at 804.

**6.** Under section 413, an employer can, by taking reasonable precautions, escape liability for an independent contractor's work that involves a peculiar risk, whereas under section 416 the employer cannot escape liability and is absolutely liable for the independent contractor's negligence. *See* Restatement § 416 (1965). Section 416 is similar to the inherently-dangerous-work exception. *See* Restatement § 427 cmt. a (1965). Additionally, unlike section 413, section 416 is not predicated on the personal negligence of the employer; rather, it is a rule of vicarious liability, making the employer liable for the negligence of the independent contractor irrespective of whether the employer himself was at fault. Restatement Ch. 15, Topic 2, Introductory Note.

nary circumstances and the employer's absolute *liability* for inherently dangerous activities. *El–Meswari v. Washington Gas Light Co.,* 785 F.2d 483, 492 (4th Cir.1986). Inherently dangerous work has been described as that which is dangerous no matter how skillfully done. *Agricultural Warehouse, Inc. v. Uvalle,* 759 S.W.2d 691, 696 (Tex.App.—Dallas 1988), *writ denied per curiam,* 779 S.W.2d 68 (Tex.1989). Work is inherently dangerous if it *"must* result in probable injury to third persons or the public." *Goolsby v. Kenney,* 545 S.W.2d 591, 594 (Tex.Civ. App.—Tyler 1976, writ ref'd n.r.e.) (emphasis added). The peculiar-risk doctrine, on the other hand, applies to work that can be done safely if the risk peculiar to that work is known and appropriate precautionary steps are taken.

■ Read asks us to adopt the particular version of the peculiar-risk exception embodied in Section 413. We need not formally adopt section 413, however, because we believe a balancing of the factors present in this case under traditional Texas notions of duty is sufficient to impose on Kirby a duty to take reasonable precautionary measures designed to prevent the type of injury suffered by Read.

■ In deciding whether to apply the peculiar-risk exception in this case, this Court must balance several interrelated factors. We must weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex. 1990). Although Texas courts have traditionally considered foreseeability to be the most significant of these factors, other factors must also be considered, including whether one party had superior knowledge of the risk or a right to control the actor who caused the harm. *See Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993). In determining whether a legal duty exists, we also take into account not only the laws and policies of this state, but the law of other states and the United States and the views of respected and authoritative restatements and commentators.

*SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 351 (Tex.1995).

The dominant factor, and the one we address initially, is foreseeability. Kirby markets its products exclusively through in-home demonstrations and sales conducted by dealers. It is no great surprise that some of those applying to be Kirby dealers have histories of crime, violence, or sexually deviant behavior. Logically, if precautions are not taken to weed out applicants with such past histories, it is likely that some of them will be hired. Sending a salesperson with a history of criminal offenses or deviant sexual behavior into the home of an elderly individual or a homemaker alone or with small children, in an environment where the resident could easily be impeded from calling for help, is calculated to create a risk that an ill-intentioned salesperson will take advantage of the customer in some way.

In support of its position that no duty exists, Kirby cites the recent supreme court decision of *Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287 (Tex.1996). In *Akins,* the plaintiff sought recovery for the sexual molestation of her son by the scoutmaster of his Boy Scout troop. The local scout council, Golden Spread Council ("GSC"), had received a report that an assistant troop leader named Estes had been "messing with some boys." GSC did not report this to the Boy Scouts of America, Inc. ("BSA"), which maintained an "unfit list" containing the names of persons it considered unfit for leadership positions. As a result, Estes's name never made it onto BSA's unfit list. Thereafter, with only minimal further investigation, GSC proceeded to recommend Estes as the scoutmaster for another troop. After Estes molested the plaintiff's son, she sued GSC and BSA. The trial court granted summary judgment for both defendants, but the court of appeals reversed and remanded for trial. Although it affirmed the court of appeals' reversal of summary judgment as to GSC, the supreme court reinstated the summary judgment in favor of BSA, holding that BSA owed no duty to the victim under the particular facts of that case.

We believe *Akins* is distinguishable from the present case. First and foremost, the

duty asserted by the plaintiff in *Akins* was far-reaching in its scope:

> [Plaintiff] alleged that GSC and BSA had a duty to reasonably and properly screen, select, train, supervise and retain scout-masters. [Plaintiff] alleges that appellees breached this duty by, *inter alia,* failing to screen scoutmasters such as Estes, failing to remove scoutmasters such as Estes, failing to warn scouts and parents of scouts of numerous prior sexual abuse incidents known to appellees, and failing to take adequate measures to stop the sexual abuse of [the plaintiff's son]. The gravamen of [plaintiff's] complaint is that GSC and BSA were negligent in failing to take steps to remove Estes from his position as a troop leader.

*Akins v. Estes,* 888 S.W.2d 35, 41 (Tex. App.—Amarillo 1994), *rev'd in part and aff'd. in part sub nom. Golden Spread Council v. Akins,* 926 S.W.2d 287 (Tex.1996). Thus, the gist of the plaintiff's complaint in *Akins* was that GSC had specific information about Estes, yet failed to use it; the scope of the asserted duty was that BSA itself should have been required to "screen, train, and supervise" Estes. In rejecting this asserted duty, the supreme court emphasized not only that BSA itself had no information about Estes, but also that imposing on BSA the duty of personal screening and supervision urged by the plaintiff would be "a tremendous burden." 926 S.W.2d at 290.

Unlike the plaintiff in *Akins,* Read's cause of action is founded on Kirby's knowledge of the peculiar risk of sending persons of unknown backgrounds into private homes, a knowledge arising in part from Kirby's specific awareness of prior assaults by Kirby dealers. Moreover, the duty Read seeks to impose is not for Kirby itself to screen, train, and supervise its dealers, but for Kirby, having a direct contractual relationship with its distributors, to take reasonable precautions *through its relationship with those distributors,* including Sena. The present case would be more factually analogous to *Akins* if, for example, (1) Sena had actually discovered the reports of Carter's deviant behavior, (2) Sena failed to further investigate the reports and failed to make Kirby aware of the reports, (3)

Sena hired Carter anyway, (4) Carter assaulted Read, and (5) Read sued Kirby asserting that Kirby had a duty independently to screen and supervise all of its dealers, including Carter. If those were the facts and allegations in the present case, our analysis could well be controlled by *Akins.* The differences, however, are obvious and significant: (1) Kirby was effectively Sena's employer, putting Kirby in a position to direct, or at least warn, Sena to take precautionary measures, (2) Kirby, not Sena, was aware of previous assaults by Kirby dealers, and (3) the scope of the duty asserted by Read would require by Kirby efforts that were minimal.

In the present case, the risk created by sending an individual with felonious tendencies into the home of a vulnerable person is foreseeable both through common sense and through Kirby's actual knowledge of prior assaults by dealers selling Kirby vacuums. The record demonstrates that in 1983, for example, Linda McLean let a Kirby dealer into her apartment to demonstrate a Kirby vacuum cleaner. The dealer brought with him a set of knives as a "door opener" or "gift offering" for allowing the in-home demonstration. After beginning the demonstration, the Kirby dealer used the knives in assaulting and raping McLean. *See McLean v. Kirby Co.,* 490 N.W.2d 229, 232 (N.D.1992). When the Kirby dealer who raped McLean was hired, he had already been convicted of two assault charges and two weapons charges earlier that year. Additionally, he had a charge of criminal sexual conduct pending against him. *Id.* As with Mickey Carter, Kirby did not take any precautions in directing its independent distributor to perform a background check on the Kirby dealer who assaulted McLean. The North Dakota Supreme Court affirmed an award of damages in McLean's suit against Kirby, holding that because of Kirby's door-to-door sales requirement, Kirby created a peculiar risk and had a duty to require its distributors to investigate potential dealers before hiring them. *Id.* at 234.

It is worth noting that Gene Windfeldt, who was president of Kirby at the time of the trial in the present case, was the divisional supervisor of the North Dakota region where

the McLean rape took place at the time of that assault. Thus, his knowledge of that prior incident was not imputed but personal.

Moreover, the McLean rape was not the first recorded incident of a Kirby dealer assaulting a customer. The record contains evidence of other assaults on Kirby customers that Kirby must have been aware of. For example, in 1969 Kirby was sued by a woman who was assaulted and battered by a Kirby dealer who had a criminal record. *See Bennett v. T & F Dist. Co.,* 117 N.J.Super. 439, 285 A.2d 59 (Ct.App.Div.1971). In *Bennett* the New Jersey appellate court affirmed a denial of summary judgment sought by the defendants and remanded the cause for trial. *Id.* 285 A.2d at 62. Windfeldt, the president of Kirby since 1988, testified that in addition to the Bennett and McLean rapes, he was aware of at least one other incident, in the late 1980's, in which a woman was accosted or assaulted in her home by a Kirby dealer.[7]

Besides foreseeability, other factors also weigh in favor of imposing on Kirby a duty to take reasonable precautions. In the present case, Kirby was in an ideal position to ameliorate the peculiar risk inherent in the in-homes sales it required by motivating its distributors to take adequate safety precautions. This could be done through contractual requirements or through warnings placed in Kirby's regular communications with its distributors. Thus, Kirby is in the best position to ensure that reasonable safety precautions are taken, because it selects the work to be performed, hires contractors to perform it, and benefits from the performance of the work. *Prosser and Keeton on the Law of Torts* § 71, at 509 (5th ed. 1984); *see also* Guido Calabresi, *Optimal Deterrence and Accidents,* 84 Yale L.J. 656 (1975) (in these cases there is special reason to place initial

responsibility on employer if he is "more likely to consider the risk" and is better able to assess ways to mitigate risk); Guido Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts,* 70 Yale L.J. 499, 547 (1961).

Although the *likelihood* of injury at the hands of a Kirby dealer was not shown to be great, that factor is offset by the grave nature of the risk and the severity of the potential injury. Few crimes are considered more repugnant by our society than sexual assault. Gene Windfeldt, President of Kirby, testified that there is a serious risk involved in allowing someone with a deviant criminal background to participate in door-to-door sales. Marshall Herron, Kirby's Vice–President of Sales, testified that a person with a history like Mickey Carter's should not be retained as a Kirby dealer because he would be a threat to the people who allowed him to enter their homes.

The above factors weigh heavily in favor of imposing a duty on Kirby, but we must balance them against the social utility of Kirby's conduct, the magnitude of the burden on Kirby to take reasonable care under the circumstances, and the consequences of placing the burden of Kirby. *Greater Houston Transp. Co.,* 801 S.W.2d at 525. First, although home solicitation may be helpful to the portion of the population that is home-bound, its general social utility seems to be minimal.[8] A majority of the population appears to be content to make their purchases according to their own schedules and in a public setting, usually at a retail store or by catalog. Door-to-door sales appear to be much less prevalent than they once were, possibly reflecting society's diminishing need and desire for such services. Moreover,

---

7. Additionally, Kirby demonstrated its awareness of the peculiar risk of harm *and* of its ability to control the potential risk by its reaction to an incident in Oregon. After the rape of Linda McLean, Kirby received an "anonymous tip" that a distributor in Oregon had been indicted for child molestation. After verifying the tip, Kirby immediately terminated the distributor and notified other distributors in the Northwestern United States not to hire this particular person. Despite this directive, another distributor, Wayne Oiler, did hire the former distributor to be a dealer. Kirby promptly terminated its distribu-

tor agreement with Mr. Oiler and, in so doing, fired the indicted dealer, thus eliminating the potential risk that the dealer posed to Kirby customers.

8. We assume that the relevant conduct is Kirby's insistence that its products be marketed via in-home sales. If the relevant conduct is considered to be Kirby's failure to warn or instruct its distributors to conduct background checks, such conduct has no social utility whatsoever.

there is no evidence that Kirby's in-home sales approach is designed to benefit home-bound persons. On the contrary, the sole purpose of the approach appears to be the maximization of Kirby's profits.

Nor would placing a duty on Kirby to require or warn its distributors to screen potential dealers be a significant burden on Kirby. Some jurisdictions have imposed a stricter than normal duty on all companies that hire persons to enter prospective customers' homes or otherwise come into close contact with the public.[9] The Restatement would require that Kirby provide in its Distributor Agreement that its distributors take special precautions, or that Kirby exercise reasonable care in some other manner, to alleviate the peculiar risk of in-home demonstrations and sales. *See* Restatement (Second) of Torts § 413(a)–(b) (1965). Thus, the mere issuance by Kirby of a *warning* to its distributors of the peculiar risk of door-to-door sales and the need to conduct background checks on prospective dealers might, by itself, satisfy its duty of reasonable care.[10] Either way, the magnitude of this burden on Kirby is small.

Kirby also argues, however, that the consequences of placing this burden on it would be burdensome on its *distributors,* who would actually have to perform the background checks. This argument appears disingenuous, because Kirby's practice since 1992 has been to instruct *some* of its distributors to "Always Be Sure To Have A Thorough Criminal Background Check Performed On Each Applicant Before Recruiting Anyone." Although the training manual containing this instruction was only offered *for sale,* to distributors who attended certain Kirby conferences *in Cleveland,* Kirby presumably would not have gone to the trouble of printing it if it had not wanted the distributors who did obtain it to abide by its warning. Thus, Kirby itself obviously felt that the benefits of performing background checks on prospective dealers outweigh any burdens the performance of such checks imposes on its distributors.[11]

Further, Texas courts have often imposed an additional duty with regard to investigating a prospective employee in situations where the employee has special access to a particularly vulnerable group. *See Porter v. Nemir,* 900 S.W.2d 376, 386–87 (Tex.App.—Austin 1995, no writ) (recognizing higher duty in context of drug and alcohol abuse treatment counselors); *Deerings W. Nursing Ctr. v. Scott,* 787 S.W.2d 494, 496 (Tex.App.—El Paso 1990, writ denied) (recognizing higher duty with respect to persons involved in care of elderly); *cf.* Tex. Educ.Code Ann. § 44.034 (West 1996) (requiring any person who contracts with school district to give notice of prior convictions).[12]

9. *See, e.g., Connes v. Molalla Transport System, Inc.,* 831 P.2d 1316, 1321–22 (Colo.1992) (in cases involving close contact with public or close contact with particular persons, employer's duty of reasonable care is not satisfied by mere review of personal data disclosed by applicant on job application form or during personal interview); *Tallahassee Furniture v. Harrison,* 583 So.2d 744, 751 (Fla.Dist.Ct.App.1991) ("If an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so.").

10. It has been argued that section 413 of the Restatement should not formally be adopted because it can be read to obligate employers to enter into particular contracts with their independent contractors: "In practice, the Restatement formulation may undermine the advantages of doing business through independent contractors, advantages which accrue to the public as well as the employer and which the general rule of non-liability is intended to preserve. Imposi-

tion of a duty to warn has no such untoward effects." *Good Humor,* 757 F.2d at 1312 (Bork, J., concurring). Because our holding is based on traditional Texas duty principles rather than section 413 of the Restatement, and because even a duty to warn is sufficient to affirm Kirby's liability under the facts of this case, we need not enter that debate.

11. Sena apparently had not received the manual and was unaware of the warning in it.

12. Texas courts have also imposed liability for failing to search beyond an employee's application in situations involving drivers of large vehicles and armed security guards. *See Wasson v. Stracener,* 786 S.W.2d 414, 422 (Tex.App.—Texarkana 1990, writ denied) (fact issue regarding failure to check independent contractor's driving record); *North Houston Pole Line Corp. v. McAllister,* 667 S.W.2d 829, 834 (Tex.App.—Houston [14th Dist.] 1983, no writ) (employer did not check driving history before hiring to drive large truck); *Estate of Arrington v. Fields,* 578 S.W.2d

We conclude that the balance of factors weighs in favor of imposing on Kirby a duty in this case. Accordingly, we hold that, under the circumstances of this case, Kirby had a duty to take reasonable precautions to prevent or deter its distributors from hiring persons with histories of crime, violence, or sexually deviant behavior as Kirby dealers. Kirby cannot insulate itself from liability in its own field of business when it requires its distributors to hire salespeople to make in-home demonstrations, knowing of the risks inherent in home solicitation, yet does not take reasonable steps to minimize those risks. *Cf. MBank El Paso, N.A. v. Sanchez,* 836 S.W.2d 151, 153 (Tex.1992) (when duty is imposed by law on basis of concerns for public safety, party bearing duty cannot escape it by delegating it to independent contractor).

### (ii) Duty under Restatement (Second) of Torts § 414

▮ Independent of the peculiar-risk doctrine, we think Kirby also owed Read a duty of care under section 414 of the Restatement. The question of control over the work performed by an independent contractor or his employees arises in connection with questions concerning liability of the employer of the independent contractor to third persons for the negligence of the independent contractor or its employees. The supreme court expressly recognized an exception to the general rule of non-liability of the employer when it adopted section 414 of the Restatement. *See Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985). Section 414 provides: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care." Restatement § 414 (1965). This rule applies when the employer retains control over some aspect of the independent contractors work, but does not retain the degree of control that will subject him to liability as a "master" under traditional master-servant law. *Redinger,* 689 S.W.2d at 418; Restatement § 414, cmt. a (1965); *see also Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19–20 (Tex.1987). The employer's specific control must be more than a right to order that work start or stop or that progress reports be generated. *See Redinger,* 689 S.W.2d at 418 (citing Restatement § 414, cmt. c (1965)). The right to control an independent contractor or his employees can arise either by contract or by course of dealing. *Pollard v. Missouri Pac. R.R.,* 759 S.W.2d 670, 671 (Tex.1988).

Kirby argues that section 414 and *Redinger* are limited to premises liability cases and are not applicable to the facts of this case. We disagree. In *Redinger,* the supreme court adopted section 414 in its entirety and did not limit its future application solely to premises liability cases.[13] Thus, the *Redinger* rule of liability logically applies to any set of facts that satisfies the requirements of section 414. *See Tirres v. El Paso Sand Prods., Inc.,* 808 S.W.2d 672, 676 (Tex.App.—El Paso 1991, writ denied); *Parker v. Enserch Corp.,* 776 S.W.2d 638, 643 (Tex.App.—Dallas 1989), *aff'd in part and rev'd in part,* 794 S.W.2d 2 (Tex.1990) (affirming that portion of appellate court's judgment dealing with control of independent contractor). In

173, 178 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.) (security company had "duty to make inquiry as to the competence and qualifications of those he considers for employment, especially where engaged in an occupation which could be hazardous to life and limb and requires skilled or experienced servants," particularly where application revealed prior arrests).

**13.** Although the majority of Texas cases imposing liability on employers of independent contractors for negligently retained control have involved an employer who was an owner or occupier of the premises where the injury occurred, these cases do not limit the application of *Redinger* or section 414 to those particular fact patterns. *See, e.g.,* *Exxon Corp. v. Quinn,* 726 S.W.2d 17 (Tex.1987); *Davis v. R. Sanders & Assoc. Builders,* 891 S.W.2d 779 (Tex.App.—Texarkana 1995, no writ); *Staublein v. Dow Chemical Co.,* 885 S.W.2d 502 (Tex.App.—El Paso 1994, no writ); *Welch v. McDougal,* 876 S.W.2d 218 (Tex.App.—Amarillo 1994, writ denied); *Pena v. TXO Prod. Corp.,* 828 S.W.2d 188 (Tex.App.—Corpus Christi 1992, no writ); *Ross v. Texas One Partnership,* 796 S.W.2d 206 (Tex.App.—Dallas 1990), *writ denied per curiam,* 806 S.W.2d 222 (Tex.1991); *EDCO Prod. Inc. v. Hernandez,* 794 S.W.2d 69 (Tex.App.-San Antonio 1990, writ denied); *Parker v. Enserch Corp.,* 776 S.W.2d 638 (Tex.App.—Dallas 1989), *aff'd in part and rev'd in part,* 794 S.W.2d 2 (Tex.1990).

applying this rule, if the employer is found to have retained sufficient control, it can be held liable "unless [it] exercises [its] supervisory control with reasonable care so as to prevent the work *which [it] has ordered to be done* from causing injury to others." Restatement § 414, cmt. a (1965) (emphasis added).

Kirby retained strict control over exactly how and where its products were to be sold. To maximize its profits, Kirby required its distributors and dealers to enter into people's homes and engage in extensive personal contact in an isolated setting. Nonetheless, Kirby contends its contractual requirements with its distributors are not evidence of control, but merely contract terms that are "conditions of employment." We disagree.

In support of its contention, Kirby cites *Farrell v. Greater Houston Transp. Co.,* 908 S.W.2d 1 (Tex.App.—Houston [1st Dist.] 1995, writ denied), and *Ross v. Texas One Partnership,* 796 S.W.2d 206 (Tex.App.—Dallas 1990), *writ denied per curiam,* 806 S.W.2d 222 (Tex.1991). In *Farrell,* the plaintiffs sued the Yellow Cab Company after one of its independently contracted drivers struck the plaintiffs' car, injuring them. In affirming a summary judgment against the plaintiffs, the court said that the driver's work was completely independent in that he controlled "how, when, *where,* and if he worked." *Farrell,* 908 S.W.2d at 3 (emphasis added). Additionally, the court held that although the title to the cab was in Yellow Cab's name, this was merely for insurance purposes and a prerequisite to signing the independent contractor agreement. *Id.* at 4. Similarly, in *Ross,* the plaintiff, who was shot by a security guard, sued the owner of the apartments where the security guard worked. *Ross,* 796 S.W.2d at 210. The Dallas Court of Appeals affirmed a summary judgment against the plaintiff, holding that although the contract between the parties specified certain tasks to be undertaken by the security company, the owner of the apartments did not have the right to control the "methods" of accomplishing those tasks assigned to the security company. *Id.*

Unlike both *Ross* and *Farrell,* Kirby's requirement that its distributors and dealers sell exclusively through in-home demonstrations is a contractual mandate evincing Kirby's exercise of control over the medium and locality for selling its products. In both *Ross* and *Farrell,* we think liability would have attached if, as here, the employer had retained contractual control over the manner and location in which the task was to be accomplished.

Kirby also cites *Tirres v. El Paso Sand Prod., Inc.,* 808 S.W.2d 672 (Tex.App.—El Paso 1991, writ denied), for the proposition that contractual requirements are merely contract terms and not evidence of control. *Tirres* stands for the proposition that section 414 does not purport to impose general vicarious liability on the employer for the independent contractor's entire performance; the exception to the general rule still applies when the employer retains control over the *specific* aspect of the contractor's work alleged to have caused the injury. *Id.* at 676. Stated another way,

> [S]ection 414 imposes a duty on the employer, who has retained the right to control the independent contractor in some aspect of his work, to exercise reasonable care in the exercise of that control so as to avoid proximately causing injuries or damages to others *while in the performance of the particular aspect [being controlled].*

*Id.* (emphasis added); *cf. Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex.1993) (in cases alleging negligent security, court's inquiry must focus on who had specific control over safety and security of premises, rather than more general right of control over operations).

Here, Kirby retained the right to control precisely where and how its products were to be sold—through personal in-home demonstrations. After retaining this control in the present case, Kirby failed to take any precautions regarding Sena's activity in recruiting dealers to perform such demonstrations. Because Kirby retained the right to control where and by what method its distributors and dealers sold Kirby products, and because it was this aspect of the marketing process that gave rise to the risk of harm to customers, we conclude that Kirby had a duty of care toward Read under section 414 of the

868

Restatement. *See Tovar v. Amarillo Oil Co.,* 692 S.W.2d 469, 470 (Tex.1985); *see also Exxon Corp. v. Quinn,* 726 S.W.2d 17, 20 (Tex.1987).

Summarizing the duty issue, we hold that Kirby was under a duty to take reasonable precautions to prevent the assault on Read because of the peculiar risk inherent in permitting in-home sales to be conducted by persons with histories of crime, violence, or sexually deviant behavior. Additionally, Kirby was under a duty to take appropriate care because, by requiring that its products be sold only through in-home demonstrations, Kirby exercised sufficient control to owe a duty of reasonable care to Read in connection with the selection of persons to perform those demonstrations. We need not address precisely what steps would be necessary to satisfy the duty Kirby owed to Read.[14] We overrule points of error one and two.

### Proximate Cause

In its third point of error, Kirby argues that evidence is legally insufficient to show that Kirby's negligence proximately caused Read's damages. In deciding a no-evidence point, this Court must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). We will uphold the finding if more than a scintilla of evidence supports it. *Id.* The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Id.*

The components of proximate cause are "cause in fact" and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995); *Travis v.*

*City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992). The test for cause in fact is whether the negligent "act or omission was a substantial factor in bringing about the injury" without which the harm would not have occurred. *Doe,* 907 S.W.2d at 477 (quoting *Prudential Ins. Co. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995)). Cause in fact is not shown if the defendant's negligence did no more than furnish a condition that made the injury possible. *Doe,* 907 S.W.2d at 477; *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 776 (Tex.1995). The question of proximate cause is one of fact that is particularly within the province of the jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances. *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 756 (Tex.1975); *Yap v. ANR Freight Sys., Inc.,* 789 S.W.2d 424, 425–26 (Tex.App.— Houston [1st Dist.] 1990, no writ).

In the present case, Kirby's lack of an instruction or warning advising Sena to conduct a background investigation or at least call Carter's past employers and references was a substantial factor in bringing about Read's injury. It did not simply cause Read to be in the wrong place at the wrong time. *See Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 472 (Tex.1991) ("There may be cases in which ... a defendant's negligence exposes another to an increased risk of harm by placing him in a particular place at a given time."). Although Sena admitted that he did not call Carter's references or past employers or do any other type of background check, he testified that he *would have done so if directed to by Kirby.* It is undisputed that if Sena had merely called Carter's prior employers or references, he would have learned about Carter's deviant history and would not have hired him as a Kirby dealer.

14. Although Kirby's first two points of error state that the evidence is both legally and factually insufficient to show that it *breached* any duty to Read, Kirby's entire argument under these points of error focuses on whether Kirby owed Read a duty at all, not on the sufficiency of evidence in support of a breach of duty. *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 522–23 (1991) ("The 'no duty' varia-tion of the 'no evidence' point is qualitatively different from a no evidence point where the law is clear but the facts are not"). If Kirby intended its points of error to assert that the evidence was insufficient to support the finding of a *breach* of duty, it waived that complaint by failing to argue it. *See* Tex.R.App. P. 74(f); *Green v. Reyes,* 836 S.W.2d 203, 213 (Tex.App.—Houston [14th Dist.] 1992, no writ).

Kirby contends the recent supreme court case of *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex.1995), precludes a finding of proximate cause against Kirby. We disagree. In *Doe,* the plaintiffs sought damages based on sexual molestation of minor boys by a man named Mullens, who had worked as a volunteer at the Boys Club. *Id.* at 476. The molestations occurred on trips not sponsored by the Boys Club. The plaintiffs contended the Boys Club was negligent in that a background check of Mullens would have revealed a conviction for driving while intoxicated. *Id.* In holding that the Boys Club's conduct was not a cause in fact of the sexual assault, the *Doe* court made two observations. *Id.* at 477–78. First, it was not established that, even if the Boys Club had known of Mullens's conviction, it would have prohibited him from being a volunteer. Second, because the sexual assaults occurred at non-sponsored activities, "Mullens' presence at the club was but a preliminary condition in the course of events which made possible his assaults...." *Id.* at 478.

The present case is easily distinguished from *Doe.* First, as discussed above, if Sena had been directed by Kirby to investigate Carter's employment or criminal history, he would have done so, would have learned about Carter's deviant history, and would not have hired him as a Kirby dealer. Moreover, while the molestations in *Doe* took place on "private camping trips" not connected to the Boys Club, Carter was in Read's home specifically to give a Kirby demonstration and try to make a sale of a Kirby vacuum. Indeed, it was only through Carter's cloak of legitimacy as a Kirby dealer that he gained access to Read's home at all. We conclude there is more than a scintilla of evidence to show that Kirby's failure to warn or instruct its distributor Sena to conduct a background check of Carter was a cause in fact of Read's injury.

 The other element of proximate cause is foreseeability, which requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission. *Doe,* 907 S.W.2d at 478; *Travis,* 830 S.W.2d at 98; *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546,

549–50 (Tex.1985). The particular accident need not be foreseen, but the injury must be of such a general character as might reasonably have been anticipated. *Nixon* 690 S.W.2d at 551; *Carey v. Pure Distrib. Corp.,* 133 Tex. 31, 124 S.W.2d 847, 849 (1939).

Kirby contends the injury to Read was not foreseeable because in the eighty-year history of Kirby, there have apparently been only three reported assaults on Kirby customers by dealers during in-home demonstrations before Carter's assault on Read. Foreseeability, though, does not require that parties anticipate the precise manner in which injury will occur once they have created a dangerous situation through their negligence. *Travis,* 830 S.W.2d at 98. As discussed above, many of Kirby's officers, including both its president and vice-president of sales, acknowledged that allowing someone with a background like Carter's to be sent behind closed doors selling Kirby vacuum cleaners creates a risk so severe that anything reasonable should be done to prevent it. This testimony, combined with evidence that Kirby was aware of at least three prior assaults on women by Kirby dealers during in-home demonstrations, constitutes more than a scintilla of evidence that Read's injury was foreseeable. We overrule point of error three.

In its fourth point of error, Kirby asserts that the evidence is factually insufficient to support the jury's finding that Kirby's negligence proximately caused Read's injuries. When reviewing a fact finding to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if the evidence is so weak as to make the finding clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Having examined all the evidence, and in light of our discussion above, we conclude the evidence supporting the jury's finding that Kirby's negligence proximately caused Read's injuries is not so weak as to make the finding clearly wrong and unjust. *See Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994). We overrule point of error four.

## Punitive Damages

██ In its fifth point of error, Kirby argues that the evidence is legally insufficient to support the finding that Kirby acted with gross negligence. We agree. The test for gross negligence contains both an objective and a subjective component. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 21–22 (Tex.1994); *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 325–26 (Tex.1993). Objectively, the defendant's conduct must create "an extreme degree of risk." *Moriel,* 879 S.W.2d at 22. Subjectively, the defendant "must have actual subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety or welfare of others." *Id.* at 23.[15]

██ The objective component of gross negligence is "a function of both the magnitude *and the probability* of the potential injury, [and] is not satisfied if the defendant's conduct creates a remote possibility of serious injury; rather, the defendant's conduct must create the *'likelihood* of serious injury' to the plaintiff." *Universal Servs. Co., Inc. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995) (citing *Moriel,* 879 S.W.2d at 22) (emphasis added). In *Ung,* a member of a road crew was killed when he was struck by a trailer that became detached from its truck when the truck hit a pothole. 904 S.W.2d at 639. Eight months prior to Ung's death, his supervisor had witnessed another trailer come loose after hitting the same pothole. Although no one was injured on that earlier occasion, the supervisor was clearly aware of the pothole and knew that his crew was working near it the day of Ung's death. *Id.* In a suit against Universal brought by Ung's survivors, a jury found Universal grossly negligent. The supreme court reversed the finding of gross negligence against Universal, holding that "even though the adjacent pothole had previously caused at least one other trailer to decouple, this evidence is *as a*

*matter of law* not sufficient" to create the likelihood of serious injury. *Id.* at 642 (emphasis added).

██ As to this issue, we are unable to find a meaningful distinction between the present case and *Ung.* Based on that controlling precedent, the evidence in the present case, even viewed in the light most favorable to the jury's verdict, does not show that an assault by a Kirby dealer on a customer was "likely." At the time of trial in this case, there were over 700 Kirby distributors and 12,000 Kirby dealers around the world. To maintain this sales force, Kirby distributors recruit roughly 50,000 people each year for dealer positions. These distributors and dealers provide approximately 1.5 million in-home demonstrations annually. Even with this number of demonstrations, there is evidence of only four reported incidents of sexual assault by a dealer or distributor against a customer in Kirby's eighty-year history. While the seriousness of the injury is indisputably extreme, and even though it was reasonably foreseeable that such an assault *could* occur, nonetheless the record contains no evidence that it was *likely* to occur. *See Ung,* 904 S.W.2d at 642. The evidence is legally insufficient, therefore, to support the finding of gross negligence against Kirby.[16] We sustain point of error five.

Having sustained Kirby's fifth point of error, we need not address its remaining points, which challenge the finding of gross negligence and the award of exemplary damages.

## Read's Cross Point

In a single cross-point, Read argues that the trial court erred by not accepting the jury's first determination of actual damages. During the jury deliberations for the second phase of the trial, the jurors sent out a note saying that they had reached an impasse in

---

15. A slightly different definition of gross negligence is now provided by statute. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.001(5) (West Supp. 1997). The present suit, filed before the effective date of section 41.001(5), is not subject to the statutory definition. *See* Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108, 113.

16. We note that in *McLean,* the Supreme Court of North Dakota also concluded as a matter of law that the plaintiff was not entitled to recover exemplary damages from Kirby. *See* 490 N.W.2d at 246–47.

determining exemplary damages: some jurors felt that exemplary damages were included in the actual-damage finding made after the conclusion of the trial's first phase.[17] The court gave the jury a standard *Allen* charge [18] and the jury continued deliberations. In order to cure the jury's confusion, the trial judge suggested telling the jurors that in light of their uncertainty, they should carefully review the charge to see if they followed the instructions in answering the actual-damages questions; if the jurors were not satisfied with how they followed the instructions, they should deliberate further on both exemplary damages and actual damages simultaneously. Counsel for Read did not object to the procedure suggested by the trial court, but expressed concern about the substance of the instruction to be given to the jury. Only counsel for Kirby objected, stating his opposition to giving *any* further instructions.

After additional discussion among the parties, the trial judge explained the specific instruction he proposed to give the jury and asked the parties' trial counsel if that was satisfactory. Read's counsel responded, "If we're going to give an instruction, *I'm satisfied with that instruction Your Honor.*" (Emphasis added.) Counsel for Kirby again was the only party to lodge an objection. The court overruled Kirby's objection and gave the instruction to the jury orally in open court.[19]

After further deliberations, the jury returned a new damages verdict, finding $200,000 in actual damages and $1,500,000 in exemplary damages. It was at this time that Read first objected, asking the court to allow a brief period of reargument. The court denied this request, accepted the jury's verdict, and released the jurors from their oath.

Without regard to whether the trial judge erred in giving the jury the supplemental instruction, Read waived any right to complain by failing to object timely to the trial court's action. Objections to supplemental jury instructions must be made in conformity with the rules regarding the charge. *Garza v. Southland Corp.,* 836 S.W.2d 214, 219–20 (Tex.App.—Houston [14th Dist.] 1992, no writ); *see also* Tex.R. Civ. P. 272, 286. Rule 272 provides that in every instance, on penalty of waiver, a party shall present to the court objections to the court's charge before the court reads the charge to the jury. *See* Tex.R. Civ. P. 272; *Missouri Pac. R.R. v. Cross,* 501 S.W.2d 868, 872–73 (Tex.1973). Thus, in order to preserve for appellate review a complaint about a supplemental charge, a party must make any objections or requests to such a charge before it is read to the jury. *Cf. George Pharis Chevrolet, Inc. v. Polk,* 661 S.W.2d 314, 317–18 (Tex.App.—Houston [1st Dist.] 1983, no writ) (failure to object to court's further communications and instructions to jury constituted waiver). By failing to object to the supplemental instruction in the present case until after it was read to the jury and after the jury deliberated and returned a verdict, Read waived any complaint. Indeed, before the instruction was read, Read's counsel affirmatively told the trial court they were "satisfied" with the instruction. Although *Kirby* objected to the supplemental instruction before it was read to the jury, Read may not use another party's objection to preserve error where the record does not reflect a timely expression of her intent to adopt the objection. *See Martinez v. State,* 833 S.W.2d 188, 191 (Tex.App.—Dallas 1992, pet. ref'd).

---

**17.** The note the jury sent out stated, "We have reached an impass [*sic* ]. Some feel exemplary damages were included in the 1.5 million. We also feel –0–exemplary damages would tell Kirby we condone their business practices."

**18.** *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

**19.** Specifically, the trial court instructed the jury:
I want you to retire to the jury room to carefully review the charge and the instructions concerning Questions 5 and 7 [the actual and exemplary damages questions] to see if you have followed the instructions in answering the questions in the charge. If you are satisfied that you have followed the instructions concerning Questions 5 and 7, then you may return into court with your verdict on both charges. If you are not so satisfied, then you may deliberate further in light of the instructions on Questions 5 and 7, and then the presiding juror may make any changes beside the original answer and initial those changes.

872

Although rule 286 of the Rules of Civil Procedure does allow for additional argument following a supplemental instruction, permitting such argument is expressly committed to the trial court's discretion. *See* Tex.R. Civ. P. 286. We cannot say that the trial court in the present case abused its discretion in denying Read's request. We overrule Read's cross-point.

## CONCLUSION

Having concluded that the evidence is legally insufficient to support the finding of gross negligence, we reverse the portion of the trial court's judgment awarding exemplary damages and render judgment denying such damages. We affirm the remainder of the trial court's judgment.