Affirmed and Opinion filed December 12, 2006








Affirmed and Opinion filed December 12, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00931-CV

____________

 

BAYER CORPORATION N/K/A BAYER
MATERIALSCIENCE L.L.C., Appellant

 

V.

 

DX TERMINALS, LTD., Appellee

 



 

On Appeal from the 152nd
District Court

Harris County, Texas

Trial Court Cause No. 01-56728

 



 

O P I N I O N








Bayer Corporation, now known as Bayer MaterialScience
L.L.C., appeals from a judgment awarding damages to DX Terminals, Ltd.  DX sued
Bayer for breach of contract, alleging Bayer failed to comply with an agreement
for the sale of caustic soda from Bayer to DX.  DX also claimed that Bayer
intentionally interfered with DX=s contractual
relationship with one of its customers.  In turn, Bayer counterclaimed against
DX, also alleging breach of contract.  A jury found that each side failed to
comply with the agreement, that DX suffered $7.5 million in damages as a result
of Bayer=s breach, and that
Bayer suffered $40,000 as a result of DX=s breach.  The
jury further found that Bayer did not intentionally interfere with DX=s contractual
relationship.  The trial court offset the award to Bayer against DX=s recovery and
awarded DX $7,460,000 as actual damages, as well as prejudgment interest of
$512,273 and post-judgment interest at 6 percent.  The court additionally
ordered each side to pay its own costs.

On appeal, Bayer contends that the trial court erred in (1)
refusing to grant Bayer=s motion for a directed verdict when the
evidence conclusively established that DX=s material breach
of the contract substantially impaired the value of the whole contract to
Bayer; (2) refusing to disregard as immaterial the jury=s finding that
Bayer failed to comply with the contract; (3) refusing to grant Bayer=s motion to
disregard jury findings where the evidence was legally and factually
insufficient to support the finding that Bayer failed to comply with the
contract; (4) refusing to provide the jury with additional instructions
regarding Bayer=s right to cancel the contract when the
jury sent out a note requesting such instruction; (5) admitting the testimony
of DX=s damages expert,
which was based on improper methodology and improper foundation; (6) awarding
DX damages for lost profits when such were precluded by the contract and
applicable law; and (7) awarding DX damages and failing to suggest a remittitur
when the evidence was legally and factually insufficient to support the jury=s damages award. 
In a cross-appeal, DX contends that the trial court erred in calculating
prejudgment interest and in ordering each side to pay its own costs.  We
affirm.

I.  Background[1]








In 1998, Bayer and DX entered into a monthly installment
contract for the sale of caustic soda from Bayer to DX.  Caustic soda is a
by-product of chlorine production, and Bayer had begun construction of a AChlor-Alkali@ unit at its
Baytown, Texas facility.  Bayer needed a buyer for the caustic soda.  DX
planned to resell the soda to affiliated companies (which used the caustic soda
in producing bleach) as well as to outside customers, including principally
Davison Petroleum.  Under the contract, Bayer agreed to sell and DX agreed to
buy between 135,000 and 150,000 dry short tons of caustic soda per year (or
11,250 to 12,500 tons per month) for a five-year period beginning in February
1999.  Although the contract called for distribution of the annual amounts in
equal monthly volumes, there was evidence at trial that this equality of
monthly volumes was Aartificial,@ and that the
parties understood that exactly equal amounts would be impossible.  The
contract also specified that certain volumes would be shipped each month by
rail car, by tanker truck, and by barge.  Pricing under the contract was to be
calculated based on the lowest of three possible measures of price minus $27.50
per ton.  The three possible measures were (1) the Acontract price@ for caustic soda
published by Chemical Market Associates, Inc., (2) the Aspot price@ published by
CMAI, and (3) DX=s average purchase price for non-Bayer
caustic soda for the current month.  Thus, DX=s price was $27.50
less per ton than the lowest of three market measures.[2]

Disputes between the parties arose early in the contract
period.  For example, the parties bickered over who was to set the annual
volumes and who was at fault for apparent logistical problems.  DX contends
that because Bayer=s Chlor-Alkali unit was unprofitable and
Bayer became convinced that the contract was too advantageous for DX, Bayer
engaged in a scheme to restrict the volumes of caustic soda sold to DX.  DX
supported this assertion at trial with various internal Bayer documents.  DX
further contended that the restriction of volumes to below the required
contract minimums breached the contract.








In 2000, Bayer began selling caustic soda directly to
Davison, who was DX=s largest external customer.  In December
2000, DX notified Davison that it was cancelling their contract effective
December 31, 2001.  Although the precise reasons for this cancellation are
unclear, Davison was apparently to some degree dissatisfied with DX=s service under
the contract, and DX may have believed that it could make more money selling
caustic soda to other customers.  Davison stopped ordering caustic soda from DX
in May 2001, well before the cancellation date.  From May through August 2001,
DX removed substantially less caustic soda from Bayer=s facility than
the contract required.  Bayer contended at trial that the buildup of caustic
soda inventories occasioned by DX=s failure to
remove contract minimums threatened an inventory emergency that could have
caused Bayer to shut down its entire Baytown facility, resulting in millions of
dollars in lost profits.  On September 11, 2001, Bayer terminated the contract,
stating as its reason, ADX=s continuing
failure to take and pay for at least 135,000 dry short tons per year, in equal
monthly volumes.@

DX sued Bayer for breach of contract and tortious
interference with DX=s contractual relationship with Davison. 
Bayer counterclaimed for breach of contract based on DX=s failure to
remove the required amounts of caustic soda.  At trial, the parties offered
competing evidence regarding who was at fault for contract shortfalls and
difficulties in processing orders, whether DX=s failure to take
contract minimums during certain months substantially impaired the value of the
whole contract to Bayer, and whether Bayer=s alleged
impending inventory crisis was real or merely a justification for cancelling
the contract.  DX=s expert witness on damages, Ron Vollmar,
calculated that DX suffered pre-cancellation damages of $1.6 million and
post-cancellation damages of $13.1 million.  Bayer presented evidence that it
suffered $40,000 in demurrage charges for caustic soda that was loaded on
barges in March 2001 but which DX did not take.

During deliberations, the jury sent out a note asking:  AProvided that
there is no cancellation clause in the contract, will cancellation in itself
constitute a breach of contract?@  Although Bayer=s counsel argued
that the correct answer to the jury=s query was Ano,@ and that barring
that answer, the court should read several UCC sections to the jury, he further
stated that the court had already given the jury a correct charge.  The trial
judge responded to the jury=s query by instructing:  APlease answer the
question in accordance with the instructions given and the Charge.@  The next day,
Bayer=s counsel tendered
a proposed written instruction regarding cancellation, which the court denied.








The jury found that both parties breached the agreement but
that Bayer did not tortiously interfere with DX=s contractual
relationship with Davison.  The jury awarded DX $7.5 million for Bayer=s breach, and it
awarded Bayer $40,000 for DX=s breach.  The trial court entered judgment
in accordance with the jury verdict, calculating pre-judgment interest from
December 31, 2003, the last day that the contract would have been enforced, and
ordered each party to pay its own costs.

II.  Substantial Impairment

In its first issue, Bayer contends that the trial court
erred in refusing to grant its motion for a directed verdict.  It reasons that
because the evidence conclusively established that DX=s material breach
substantially impaired the value of the whole contract, Bayer was justified in
cancelling and cannot be held liable for damages.  We review this matter-of-law
issue under the well-established standards.  See City of Keller v.
Wilson, 168 S.W.3d 802, 814-816, 823 (Tex. 2005).








In the contract, the parties agreed that Pennsylvania law
would govern any disputes.[3] 
On appeal, the parties specifically agree that the contract at issue is an
installment contract for the sale of goods governed by the Pennsylvania version
of the Uniform Commercial Code.[4] 
Under the UCC, when one party to an installment contract defaults with respect
to one or more installments and thereby substantially impairs the value of the
whole contract to the other party, such default constitutes a breach of the
whole contract.  Pa. Cons. Stat. ' 2612.  When such
a breach occurs and the nonbreaching party is the seller (as Bayer was here),
the seller has the right, among other options, to cancel the contract.  Id.
' 2703.  Bayer
contends that the evidence established, as a matter of law, substantial
impairment of the value of the whole contract as a result of DX=s breach. 
Therefore, Bayer argues, it was justified in canceling the contract and is not
liable for any damages for post-cancellation nonperformance.

It is possible to conclusively establish substantial
impairment of the value of a whole contract.  See, e.g., L&M Enters. v.
BEI Sensors & Sys. Co., 231 F.3d 1284, 1288 (10th Cir. 2000); Design
Plus Store Fixtures, Inc. v. Citro Corp., 508 S.E.2d 825, 830 (N.C. App.
1998).  However, given the subjective nature of this issue, it is typically
regarded as an issue of fact for the jury.  See, e.g., Cassidy Podell Lynch,
Inc. v. Snydergeneral Corp., 944 F.2d 1131, 1148 (3d Cir. 1991);
Extrusion Painting, Inc. v. Awnings Unlimited, Inc., 37 F. Supp. 2d 985,
997 (E.D. Mich. 1999); Emanuel Law Outlines, Inc. v. Multi-State Legal
Studies, Inc., 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995); Valley
Timber Sales, Inc. v. Midway Forest Prods., Inc., 563 So.2d 612, 613-14
(Ala. App. 1990).  In the present case, neither the evidence nor the case law
supports Bayer=s contention that it proved substantial impairment as
a matter of law.













At trial, Bayer presented evidence that DX failed to take
required contract minimums of caustic soda for four consecutive months:  May
through August 2001.[5] 
Bayer also presented evidence of the benefit derived from the contract:  having
a consistent buyer for the caustic soda generated as by-product from chlorine
production.  Bayer witnesses testified that the company had no experience in
caustic soda sales or distribution.  It was therefore willing to give a
discount to DX because DX was to handle the logistics concerned with receiving
the caustic soda from Bayer.  Bayer witnesses also testified that the company
had limited storage space for caustic soda and that when DX did not take
contract minimums, inventory levels began to climb to heights threatening to
halt chlorine production.  Witnesses further asserted that if chlorine
production halted, the resulting domino effect could have closed production at
Bayer=s entire Baytown
facility.  There was also testimony from some of DX=s expert witnesses
that this impending inventory crises was a real possibility.[6] 
In summary, Bayer=s evidence established a prima facie case
that DX=s failure to take
contract minimums over a four-month period materially breached the contract and
substantially impaired the value of the whole contract to Bayer.  However, in
determining whether Bayer conclusively proved this proposition at trial, we do
not simply look at Bayer=s evidence but must examine DX=s as well.  See
City of Keller, 168 S.W.3d at 814-816, 823.

We first consider the actual totals taken by DX during the
four-month period of the alleged breach.  DX agreed to Atake or pay@ a minimum of
135,000 dry short tons of caustic soda per year.  The contract states that
sales were to be Ain equal monthly volumes@:  135,000 tons
per year equates to a minimum of 11,250 tons per month.  Aleta Richards, the
head of Bayer=s Inorganic Basic Chemicals Marketing Group (which
oversees caustic soda sales), testified that this equality of monthly volumes
was Aartificial@ and the parties
understood that exactly equal amounts would be impossible.  In May, DX removed
6,504 tons from Bayer (or 58 percent of the target monthly minimums); in June,
DX removed 7,074 tons (or 63 percent), in July, DX removed 6,305 tons (or 56
percent); in August, DX removed 8,186 tons (or 73 percent).  In total, DX
removed 16,931 fewer tons than the target monthly minimums for these four
months.  Stated in percentage terms, the removal represented 38 percent less
than the target monthly minimums for those four months, 12.5 percent less than
the minimum DX was supposed to remove annually, and less than 3 percent of the
minimum over the life of the contract (59 months).  While these calculation do
not by themselves necessarily prove that DX=s failure to
comply did or did not substantially impair the value of the whole contract, it
places the failure to comply for those four months in perspective of the monthly,
annual, and contract totals.








Additionally, DX presented evidence that neither these nor
previous shortfalls in removing monthly minimums were not deemed a problem by
Bayer at the time they occurred, and in fact, were possibly caused by Bayer. 
There was substantial evidence that Bayer developed a policy to sell DX only
the minimum required under the contract; Bayer then rejected numerous DX orders
and failed to deliver required amounts on several occasions.[7] 
Indeed, internal Bayer correspondence offered by DX demonstrated that Bayer had
incentives to reduce the amount of shipments to DX:  Bayer believed that the
contract was too favorable to DX, and Bayer wanted to sell caustic soda
directly to Davison and others for greater profit.[8]

DX also presented evidence suggesting that Bayer=s assertion of an
imminent inventory crisis in the summary of 2001 was fictitious.  Both Bayer
and DX employees testified that Bayer did not complain to DX about the
shortfalls in the summer of 2001.  Indeed, there was evidence that inventory
levels during this period of time did not rise appreciably higher than they had
been during earlier contractual periods.  Further, Bayer had an outlet for
excess caustic soda through its direct sales to Davison.  Bayer has offered no
explanation as to how cancellation of the contract with DX would relieve its
alleged inventory problem.[9]

In summary, although Bayer presented some evidence that DX=s failure to take
contract minimums for four consecutive months substantially impaired the value
of the whole contract to Bayer, evidence submitted by DX supported the opposite
conclusion:  that the shortfalls did not substantially impair the value of the
whole contract to Bayer and that Bayer used the shortfalls as a pretext for
cancellation.








The cases cited by Bayer in support of the proposition that
substantial impairment can be proven as a matter of law are clearly
distinguishable on their facts.  For example, in L&M Enterprises,
the court held that the seller established substantial impairment as a matter
of law where there was an undisputed and complete failure by the buyer to pay
for installment shipments.  231 F.3d at 1288.  Similarly, in Design Plus
Store Fixtures, the court held that the buyer proved substantial impairment
as a matter of law where the goods delivered in the first two of three scheduled
installments were not useable as delivered.  508 S.E.2d 830.  In contrast, it
cannot be said that DX wholly failed to perform for four months.  DX performed,
at least partially, by taking approximately 62 percent of the monthly targets
for those four months.  Whether this partial performance substantially impaired
the value of the whole contract to Bayer was a question of fact, particularly
in light of the evidence propounded by DX.[10]

Bayer failed to prove as a matter of law that DX=s conduct
substantially impaired the value of the whole contract to Bayer.  Accordingly,
Bayer=s first issue is
overruled.

III.  Materiality of Jury Findings

In its second issue, Bayer assigns as error the trial court=s refusal to
disregard as immaterial the jury=s finding that
Bayer failed to comply with the contract.  A trial court may disregard a jury
finding if it is immaterial or unsupported by evidence.  Spencer v. Eagle
Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994).  A finding is
considered immaterial when the issue should not have been submitted to the
jury, or when it was properly submitted but has been rendered immaterial by other
findings.  Id.  Here, Bayer specifically contends that in finding a
failure by DX to comply with the agreement, the jury necessarily found that DX
substantially failed to perform; thus, Bayer was excused from further
performance.  We find that Bayer=s argument is not
supported by the language in the charge.








Question No. 1 reads as follows:

QUESTION NO. 1

Did Bayer Corporation or DX Terminals, Ltd. fail to
comply with the Sales Contract?

In answering this question, you are instructed that:

Failure of a party to a contract to perform in
accordance with its terms gives the other party a cause of action for breach. 
A breach of contract occurs when a party to the contract fails to perform any
contractual duty of immediate performance, or violates an obligation,
engagement or duty.

Not every nonperformance, however, is to be
considered a breach of contract.  If you find that the nonperformance was
trivial, and thus that the contract was substantially performed, you must also
find that the breach of the contract has not occurred.

Whenever non-conformity or default with respect to
one or more installments of a contract substantially impairs the value of the
whole contract, there is a breach of the whole.

In interpreting the contract, the intent of the
parties should be determined solely from the express language of their
agreement if the words of the contract are clear and unambiguous.  However, if
you find from the evidence that a particular custom or trade usage actually
existed when the contract was made and the custom or trade usage evidence does
not contradict the express terms of the contract, you may also consider
evidence of custom or trade usage in determining the parties= contractual intent.

In addition to the language of the agreement, the
law imposes on the parties to a contract the duty to perform the contract with
honesty in fact and to observe the reasonable commercial standards of fair
dealing in the trade.

Answer AYes= or ANo@ for each of the following:

a.       Bayer Corporation    
Yes   

b.       DX
terminals, Ltd.      Yes   








In
answering Ayes,@ the jury found that DX failed to
substantially perform.[11] 
The charge, however, does not define Asubstantially
perform@ other than by
reference to whether a given breach was trivial or not.  The charge equates a
finding of substantial performance of the contract  with a finding that any
nonperformance was merely trivial in nature.  Further, if any nonperformance is
merely trivial (and thus the contract was substantially performed), the
nonperforming party is not liable for a breach of contract.  And, stated
conversely, if a nonperformance is not trivial in nature (and thus the contract
was not substantially performed) then the nonperforming party is liable for
breach of contract.








Bayer takes this a step further and argues that DX=s breach
completely excused Bayer=s performance and justified its
cancellation of the contract.  This argument, however, ignores the context in
which DX=s alleged breach
occurred.  In the installment contract context, one party can materially (or
nontrivially) breach in regard to one or more installments (thus entitling the
nonbreaching party to damages) without substantially impairing the value of the
whole contract to the nonbreaching party and, hence, without excusing the
nonbreaching party=s further performance.  See, e.g., Pa. Cons. Stat. ' 2612(c) &
cmt. 6 (providing for actions seeking damages only for default on an
installment); Arkla Energy Res., A Div. of Arkla, Inc. v. Roye Realty &
Developing, Inc., 9 F.3d 855, 863 (10th Cir. 1993) (holding that even
though delay in delivery did not substantially impair the value of the whole
contract, nonbreaching party could still recover damages due to uncured breach
of installment); Gregory M. Travalio, The UCC=s Three R=s: Rejection,
Revocation and (the Seller=s) Right to Cure, 53 U. Cin.
L.Rev. 931, 1002 (1984) (stating that if a party defaults in regard to one
installment, the nonbreaching party=s remedy lies in
damages, and Aonly very serious breaches@ were meant to
enable a nonbreaching party to cancel the contract); see also Midwest Mobile
Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am., 965 F. Supp. 1003,
1015-16 (W.D. Mich. 1997) (analyzing default on one installment separately from
substantial impairment of the whole contract).[12] 
Indeed, in support of its argument that the finding of DX=s breach rendered
the finding of Bayer=s breach immaterial, Bayer cites only two
cases, neither involving installment contracts.  See Mustang Pipeline Co. v.
Driver Pipeline Co., 134 S.W.3d 195 (Tex. 2004); Hooker v. Nguyen,
No. 14-04-00238-CV, 2005 WL 2675018 (Tex. App.CHouston [14th
Dist.] Oct. 20, 2005, pet. denied).

We believe that in finding DX=s failure to
comply, the jury did not consequently find that DX substantially impaired the
value of the whole contract to Bayer.  While Question No. 1 includes a sentence
explaining that when default on one or more installments substantially impairs
the value of the whole contract, there is a breach of the whole contract, this
sentence does not state the contrary:  that a default on one or more
installments not substantially impairing the value of the whole cannot be a
breach of contract.  Thus, the jury=s finding of DX=s failure to
comply with the contract is not axiomatically converted into a finding that DX=s breach
substantially impaired the value of the whole contract to Bayer.[13] 
In other words, the charge leaves open the possibility that the jury could have
found that DX defaulted on one or more installments (thus entitling Bayer to
damages) but did not substantially impair the value of the whole contract to
Bayer.  Because the finding of DX=s breach is not
tantamount to a finding of substantial impairment, the finding on Bayer=s breach was not
immaterial.[14] 
Because there is no finding, implied or explicit, that DX=s breach
substantially impaired the value of the whole contract to Bayer, we overrule
Bayer=s second issue.

 








IV.  Sufficiency of Evidence Re: Breach

In its third issue, Bayer contends that the evidence was
legally and factually insufficient to support the jury=s finding of its
failure to comply with the contract.  See City of Keller, 168
S.W.3d at 822 (providing standards for legal sufficiency review); Pool v.
Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (providing standards for
factual sufficiency review).  Although Bayer acknowledges that it cancelled the
contract on September 11, 2001, and failed to comply with the contract terms
after that date, it argues that there is no evidence of its failure to comply
prior to DX=s breach.  Bayer also contended above that it was
justified in cancelling the contract because DX=s prior breach
substantially impaired the value of the whole contract.  Thus, Bayer has argued
that (1) the evidence was legally and factually insufficient to support a
finding that it breached prior to DX=s breach, and (2)
Bayer=s cancellation of
the contract was justified due to DX=s breach.  Bayer
therefore concludes that DX was not entitled to damages incurred either before
or after DX breached.

Jury Question No. 1, however, is not bifurcated in this
manner; it does not segregate Bayer=s alleged breaches
into categories of before and after DX=s breach. 
Moreover, we considered and rejected the justification argument above, and
Bayer acknowledges its cancellation of the contract.  Accordingly, we find that
the evidence is sufficient to support the jury finding that Bayer breached the
contract.  Bayer=s arguments regarding what damages are
available (based in part on when alleged breaches occurred) are better
addressed below in the discussion of the issues relating to damages
calculations.  Bayer=s third issue is overruled.

V.  Additional Instructions








In its fourth issue, Bayer contends that the trial court
erred in refusing to supplementally instruct the jury when the latter sent out
a note asking whether cancellation of the contract could constitute breach of
the contract.  See Tex. R. Civ.
P. 286 (permitting trial court to additionally instruct jury after they
have retired for deliberations).  DX contends that Bayer failed to preserve any
alleged error by omitting to make a timely and sufficiently specific objection
in the trial court.  See Tex. R.
App. P. 33.1(a); Tex. R. Civ. P. 272,
274, 278.  We agree with DX.

A.  Sequence of Events

At the conclusion of its case, Bayer=s counsel asked the
trial judge to judicially notice several sections from the Pennsylvania UCC,
including sections 2106 (concerning cancellation), 2610 (concerning
anticipatory breach), 2612 (concerning breach of an installment contract), and
2703 (concerning a seller=s general remedies for breach).  Pa. Cons. Stat. '' 2106, 2610, 2612,
2703.  Counsel further requested that the judge permit him to read the sections
into evidence.  The trial judge agreed to take judicial notice of the sections
but refused to allow them to be read into the record.  Specifically, the judge
stated: AWe can discuss
that on [sic] the context of the Charge.@

At some point, Bayer submitted its Adiscussion draft@ of the jury
charge.  The instructions accompanying proposed Question No. 1, regarding
whether Bayer failed to comply with the agreement, explained that in the
installment contract context, a breach of one installment is not necessarily a
breach of the entire contract and necessarily entitles the non-breaching party
only to damages pertaining to that installment.  The draft also included a
question asking whether Bayer=s failure to comply was excused due to DX=s prior material
breach.  The instructions accompanying this question explained that in the
installment context, a breach of one installment does not precipitate breach of
the entire agreement unless it substantially impairs the value of the whole
contract.  The record does not reflect whether the trial court specifically
ruled on these proposed instructions.

On February 23, 2005, the trial court held a jury charge
conference.  During the conference, Bayer neither made any objection to Question
No. 1, regarding whether Bayer breached, nor offered any instructions
concerning cancellation, excuse, or justification.  The final charge does not
identically match either Bayer=s or DX=s proposed
charges.[15]








Later on February 23, after the jury retired for
deliberations, it sent out three questions, which the trial court answered
tersely.  On the same day, the jury sent out what the trial judge called a Aclarification request.@  It stated: AProvided that
there is no cancellation clause in the contract, will cancellation in itself
constitute a breach of contract?@  Bayer=s counsel insisted
that the proper answer to the question was Ano@ and then
requested that Athe court read to the jury the sections of
which the Court took judicial notice.@  In response, DX=s counsel asserted
that the answer was not as simple as merely saying Ano,@ because a
cancellation would constitute a breach unless the cancellation was justified. 
DX=s counsel then
questioned how the court could supply Aa whole new set of
instructions on what justifies cancellation.@  To which Bayer=s counsel
responded: AThe Court=s already given
them the correct instruction.@  And the judge stated:  ARight.  Which is
exactly why I am not going to answer this question.@  Bayer=s counsel then
stated: AIf you are not
going to say directly >no,= your honor, which
I think you should, it ought to be not necessarily >read the Charge.=@  The judge then
sent the question back into the jury with the response:  APlease answer the
question in accordance with the instructions given and the Charge.@








Before the jury left for the day, it apparently sent out
two additional notes: one requesting to see certain exhibits and another
requesting a highlighter pen.  The next day, February 24, when the issue of the
additional requests was raised, Bayer=s counsel took the
opportunity to readdress the jury=s cancellation
query from the day before.[16] 
Specifically, counsel mentioned Rule 286 of the Texas Rules of Civil Procedure
and tendered proposed supplemental instructions.  Although the proposed
instructions were apparently in writing, Bayer does not cite to them in the
record.  However, Bayer=s counsel represented to the trial court
that the proposed supplemental instructions were identical to ones Apreviously
submitted,@ presumably meaning in the Adiscussion draft@ mentioned above. 
The proposed instructions apparently contained several parts, including one
specifically mentioned by counsel that Aa party to the
contract may cancel the contract if the other party to the contract is in
breach and such breach substantially impairs the whole of the contract.@  The court
responded by saying that this proposed instruction Alooks to me like .
. . one of the instructions that was submitted originally in the proposed
charge, and we chose to go a different way with this.@  DX=s counsel asserted
that Ajust sending an
unsolicited instruction in is like a lightning bolt.@  Ultimately, the
judge denied Bayer=s request.

B.  Standards for Preservation








Objections to supplemental jury instructions must be made
in conformity with the rules governing submission of the charge.  Scott
Fetzer Co. v. Read, 945 S.W.2d 854, 871 (Tex. App.CAustin 1997), aff=d, 990 S.W.2d 732
(Tex. 1998); see also Willis v. Donnelly, 118 S.W.3d 10, 29 (Tex. App.CHouston [14th
Dist.] 2003) (applying general rules of charge submission in supplemental
charge context), aff=d in part, rev=d in part, 199 S.W.3d 262
(Tex. 2006); Texaco, Inc. v. Pennzoil, Co., 729 S.W.2d 768, 833-34 (Tex.
App.CHouston [1st
Dist.] 1987, writ ref=d n.r.e.) (same).  Generally, to preserve
for appellate review a complaint premised on a defective jury charge question,
a party must bring the objectionable matter to the trial court=s attention and
state the basis for the objection.  Tex.
R. Civ. P. 274; ASEP USA, Inc. v. Cole, 199 S.W.3d 369, 377 (Tex.
App.CHouston [1st
Dist.] 2006, no pet.); Flo Trend Sys., Inc. v. Allwaste, Inc., 948
S.W.2d 4, 10 (Tex. App.CHouston [14th Dist.] 1997, no writ).  The
test for preservation of a jury charge complaint is whether the party made the
trial court aware of the complaint, timely and plainly, and obtained a ruling. 
State Dep=t of Highways & Pub. Transp. v.
Payne, 838 S.W.2d 235, 241 (Tex. 1992).  However, where an appellant
contends that the trial court improperly omitted a question or instruction on
an issue in the charge, the appellant must do more than just object to preserve
the issue on appeal.  The failure to submit a question or instruction shall not
be deemed a ground for reversal of the judgment unless a substantially correct
definition or instruction has been requested in writing and tendered by the
party complaining of the judgment.  Tex.
R. Civ. P. 278; Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162,
166 (Tex. 2002).  Thus, an appellant does not preserve the issue of an omitted
instruction or question for appellate review unless the appellant: (1) tenders
a written request to the trial court for submission of the question, (2) which
is Ain substantially
correct wording.@  See Tex. R. Civ. P. 278; Tex. Dep=t of Human Servs.
v. Hinds, 904 S.W.2d 629, 637‑38 (Tex. 1995); ASEP USA, 2006 WL
1228021, at *5.

C.  Failure to Preserve








Bayer contends that it made a timely and proper submission
to the trial court regarding cancellation when it requested a jury instruction
as follows:  A[a] party to the contract may cancel the contract if
the other party to the contract is in breach and such breach substantially
impairs the whole contract.@  This request was not made, however,
until the day after the jury sent its cancellation query.  On February 23, the
day the jury sent its query, Bayer=s counsel argued
only that the correct answer was Ano,@ and that barring
that answer the court should read four sections of the UCC to the jury.  On
appeal, Bayer does not assert that either suggestion would have been proper.  See
Wohlfahrt v. Holloway, 172 S.W.3d 630, 639-40 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied) (holding that to have preserved error, a party=s argument on
appeal must comport with its argument in the trial court).  Indeed, Bayer=s own subsequent
submission suggests that a simple Ano@ answer to the
jury=s query would have
been incorrect, indicating that cancellation could constitute a breach if it
were unjustified.[17] 
Further, Bayer does not contend on appeal that reading the UCC sections to the
jury would have either been proper or would have answered the jury=s question.  These
were the only two requests that Bayer made on the day the jury sent out its
note.  Furthermore, Bayer=s counsel inconsistently stated on this
first day that A[t]he Court=s already given
them the correct instruction.@  Moreover, because on appeal Bayer
contends that the trial court erred in omitting an instruction regarding
cancellation, it was required to submit the requested instruction in writing.  Tex. R. Civ. P. 278; Hinds, 904
S.W.2d at 637‑38.  Consequently, the oral statements made on February 23
failed to preserve error.  Tex. R. App.
P. 33.1(a); Tex. R. Civ. P. 272,
274, 278; see also Willis, 118 S.W.3d at 29 (holding oral request for
supplemental instruction was not sufficient to preserve error after jury sent
out note).

After the court responded to the question, the jury
apparently sent out two additional and unrelated requests and concluded
deliberations for the day.  At some point during the following day, Bayer=s counsel
submitted proposed supplemental instructions in writing to the court. 
Regardless of the merits of these proposed instructions, they were clearly
untimely.  See Read, 945 S.W.2d at 871 (holding that in order to
preserve error for appellate review on a complaint about a supplemental charge,
a party must make any objections or requests to such charge before it is given
to the jury); Texaco, Inc., 729 S.W.2d at 834 (holding that party failed
to preserve error when it did not object to supplemental instruction until the
following day).  The trial judge himself indicated that the request was
untimely when he stated:  AYou made the request for Additional
Instruction 286, right, based on the jury questions submitted by the jury in
writing on a point of law that was answered by the Court yesterday.  And I have
declined to reraise the issue.@  Because Bayer failed to make a proper
request regarding supplementation of the charge until the day after the jury=s note was
received and answered, it has failed to preserve its complaint for appellate
review.  Bayer=s fourth issue is overruled.

VI.  Damages








Bayer=s fifth, sixth, and seventh issues concern
the calculation and awarding of damages.  In its fifth issue, Bayer contends
that the trial court erred in admitting the testimony of DX=s damages expert
because his testimony was based on improper methodology and improper
foundation.  In its sixth issue, Bayer contends that any award of lost profits
was precluded by the contract and applicable law.  In its seventh issue, Bayer
contends that the evidence was legally and factually insufficient to support
the jury=s damages award. 
We begin by considering issue seven, challenging the legal and factual
sufficiency of the evidence regarding damages.

A.  Sufficiency

Question No. 4, concerning damages caused by Bayer=s failure to
comply with the contract, asked the jury as follows:

QUESTION NO. 4

What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate DX Terminals, Ltd. for its damages, if any, resulting
from Bayer Corporation=s failure to comply with the
contract between DX Terminals, Ltd. and Bayer Corporation?

AMarket price@ is the price for which DX
Terminals, Ltd. could have obtained caustic soda at the place of tender at the
time DX Terminals, Ltd. learned of the breach.

Consider the following elements of damages, if any, and none other:

The difference, if any, between the cost to purchase caustic soda as
substitute for caustic soda that Bayer Corporation failed to deliver and the
price for caustic soda under the contract between DX Terminals, Ltd. and Bayer
Corporation, less any expenses saved because of Bayer Corporation=s failure to comply with the
contract;

The difference, if any, between the market price for caustic soda at
the time Bayer Corporation failed to comply with the contract and the price for
caustic soda under the contract between DX Terminals, Ltd. and Bayer
Corporation, less any expenses saved because of Bayer Corporation=s failure to comply with the contract;
and

The difference between what DX Terminals, Ltd. actually earned and what
it would have earned if Bayer Corporation had complied with the contract.








Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find DX could have
avoided by the exercise of reasonable care.

Answer in dollars and cents, if any.

Answer:       $7,500,00.00

Because
Bayer did not object to the definitions and instructions contained in this
submission, we must examine the sufficiency of the evidence in light of the
charge as given.  See, e.g., Bencon Mgmt. & Gen. Contracting, Inc. v.
Boyer, Inc., 178 S.W.3d 198, 206 (Tex. App.CHouston [14th
Dist.] 2005, no pet.).  Furthermore, unless the record clearly demonstrates
otherwise, we presume that the jury followed the court=s instructions on
damages.  Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 771
(Tex. 2003).








Question No. 4 appears to instruct the jury on the UCC
buyer remedies.  Under the UCC, when a seller fails to make delivery or
repudiates the contract, as Bayer did here, the buyer may elect to Acover@ by purchasing
substitute goods and recover damages, or it may elect to simply recover damages
without attempting to cover.  Pa. Cons.
Stat. '' 2711, 2712.  If the buyer elects to cover, it is then
entitled to Arecover from the seller as damages the difference
between the cost of cover and the contract price, together with any incidental
or consequential damages . . . but less expenses saved in consequence of the
breach by the seller.@  Id. ' 2712.  Absent
cover, the buyer=s measure of damages Ais the difference
between the market price at the time when the buyer learned of the breach and
the contract price together with any incidental and consequential damages . . .
but less expenses saved in consequence of the seller=s breach.@  Id. ' 2713.  A buyer
does not have to attempt to cover before seeking damages for breach.  Id.
'2712(c).[18] 
But once a buyer obtains cover, damages are to be calculated in context of the
price paid for the cover (at least to the extent reasonable cover was
obtained).  See id. ' 2712(b); Aztec Corp. v. Tubular Steel,
Inc., 758 S.W.2d 793, 800 (Tex. App.CHouston [14th
Dist.] 1988, no writ).  The UCC presumes that cover is proper and sets the
market price.  Dura-Wood Treating Co. v. Century Forest Indus., Inc.,
675 F.2d 745, 753 (5th Cir. 1982); Kiser v. Lemco Indus., Inc., 536
S.W.2d 585, 589 (Tex. Civ. App.CAmarillo 1976, no writ); see also
Mueller v. McGill, 870 S.W.2d 673, 675-76 (Tex. App.CHouston [1st
Dist.] 1994, writ denied).

Question No. 4 contains three paragraphs describing the
elements of damages for the jury=s consideration. 
The first presents the concept of cover damages, the second presents the
calculation for non-cover damages, and the third presents incidental or
consequential damages.  The question does not, however, in any way limit or
structure the jury=s consideration of damages as among these
elements; for example, the jury could have calculated damages based on market
price under the second paragraph even though there may have been evidence that
DX obtained cover to some extent.

Bayer argues that there was no evidence in the record to
support the jury=s finding of damages in the amount of $7.5
million.  In its appellee=s brief, DX points out that the contract
itself provides the proper measure of damages when it establishes a price based
on subtracting $27.50 from the lowest of three possible determinants: the
published contract price for caustic soda, the published spot market price for
caustic soda, and the average price DX paid for non-Bayer caustic soda in any
given month (see contract excerpt below).  Bayer responds that (1) DX did not
argue this method in the trial court but instead presented through its expert a
complicated calculation of damages including pre- and post-cancellation cover,
market, and lost profits damages; (2) there is no evidence to support the
conclusion that $27.50 per ton is an accurate measure of damages for breach of
the contract, and (3) there is no evidence supporting the shortfall quantity
required to be multiplied by $27.50 per ton in order to reach the $7.5 million
found by the jury.  We will discuss each argument in turn.








1.  DX=s Trial Position

The fact that neither DX nor DX=s expert used this
exact calculation at trial in requesting or determining damages does not by
itself render the evidence insufficient to support such a calculation as DX=s damages.  First,
concerning the expert=s testimony, contrary to Bayer=s contention,
unless the subject matter requires expert testimony to be understood, a jury
does not have to rely solely on an expert=s opinion in
calculating damages.  See City of Keller, 168 S.W.3d at 820 (AEven
uncontroverted expert testimony does not bind jurors unless the subject matter
is one for experts alone.@); Bowen v. Robinson, No.
01-05-00605-CV, 2006 WL 2192792, at *8 (Tex. App.CHouston [1st
Dist.] Aug. 3, 2006, pet. filed) (holding that lost profit damages had to be
shown with reasonable certainty, were a fact-intensive determination, and could
be proven by expert testimony); Vela v. Wagner & Brown, Ltd.,
203 S.W.3d 37, 48-49, 51 (Tex. App.CSan Antonio 2006,
no pet.) (holding that jury was not required to accept expert=s damages model
but could award amount that had a rational basis and fell within the range of
evidence presented at trial); Howell Crude Oil Co. v. Donna Refinery
Partners, Ltd., 928 S.W.2d 100, 108 (Tex. App.CHouston [14th
Dist.] 1996, writ denied) (affirming award of lost profits below amount
testified to by expert, even though the specific calculation was inexplicable,
because the jury could have reasonably concluded the evidence supported the
lesser amount); Parallax Corp., N.V. v. City of El Paso, 910 S.W.2d 86,
91-92 (Tex. App.CEl Paso 1995, writ denied) (holding that
expert testimony on damages in condemnation case is not binding on jury where
there is other evidence of value).  Bayer does not suggest that damages in this
case could only be understood with the help of expert testimony, and it would
not appear that the jury would have needed expert testimony to make the
calculation in question: multiplying $27.50 times the number of shortfall
tons.  Second, a jury is not tied to awarding damages exactly as requested by
the injured party.  See City of Fort Worth v. Zimlich, 29 S.W.3d 62, 73
(Tex. 2000) (holding jury was not limited to awarding damages as requested by
party if there was evidence supporting a different amount).








Bayer cites cases requiring that calculations of lost
profits damages be based on one complete calculation.  See Szczepanik v.
First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); Holt Atherton
Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992).  However, the
calculation based on $27.50 per ton under the contract is a measure of direct
damages, not lost profit or consequential damages.  See generally
Pa. Cons. Stat. '' 2713, 2715; HGI
Assocs., Inc. v. Wetmore Printing Co., 427 F.3d 867, 878 (11th Cir. 2005). 
Further, the concept of damages Abased on one
complete calculation@ simply means that damages must be based
on one method of calculation and cannot be the result of combining figures from
several methods.  See Szczepanik, 883 S.W.2d at 649; Holt Atherton
Indus., 835 S.W.2d at 85.  These cases do not hold or suggest that
calculation of direct damages under the UCC must be supported by expert
testimony presenting a definitive calculation.[19] 
Bayer=s first argument
regarding the $27.50 per shortfall ton measure of damages is without merit.

2.  Evidence on Measure of Damages

In its second argument, Bayer asserts that no admitted
evidence supports the conclusion that $27.50 per shortfall ton was an accurate
measure of damages.  To the contrary, DX=s president, Rick
Karm, suggested in his testimony that under the contract with Bayer, DX could
always get a $27.50 discount per ton.  Additionally, Bayer=s own Aleta
Richards, head of the marketing group overseeing caustic soda sales, testified
that the contract guaranteed DX $27.50 per ton off the market price and
basically gave it $3.7 million per year.[20] 
But the best evidence that $27.50 per ton is a proper measure of damages is the
contract itself.  Addendum I to the contract reads as follows:

 








ADDENDUM I

DX Terminals, LTD

February 1, 1999 - December 31,
2003

Price

Interval:        Prices will be
established on a monthly basis pursuant to the formula set forth below, no
later than the 10th day of the current month.

Price:          All numbers are in
$ per dry short tons

Lowest of (A, B, or C) -$27.50/dst = DXT=s price from Bayer *1 *2

Where A =   CMAI published contract
price in $ per dry short tons

B =    CMAI published spot price in $ per dry short
tons

C =    DXT=s average purchase price of non-Bayer material for the
current month in $ per dry short tons

*1 If this value is less than zero,
Seller will not be required to pay Buyer, for taking delivery, and Buyer will
not be required to take delivery if the value is less than negative $10.00
unless Seller agrees to compensate Buyer.

*2 The difference between the lower
of A or B and DXT=s price from Bayer shall in no
event exceed $35/dst.  Buyer and Seller agree to meet in good faith and review
status of A, B & C.

If it is determined CMAI due to timing, unstable markets or other
reasonable factors are out of line with market.

 

Terms:         F.O.B.  Shipping
Point

Net 30 Days

Freight Collect








Thus,
DX was guaranteed a price per ton of $27.50 less than three possible indicators
of market price:  the published contract price, the published spot market
price, and the average price DX paid for non-Bayer caustic soda for any given
month.  UCC section 2713, and the jury charge, allow for damages to be
calculated based on the difference between market price and the contract price
(together with incidental or consequential damages but less expenses saved).  Pa. Cons. Stat. ' 2713.  UCC
section 2724 permits commodity market prices to be determined by reference to Areports in
official publications or trade journals or newspapers or periodicals of general
circulation published as the reports of such market.@  Id. ' 2724.  Bayer does
not suggest that the CMAI published prices referenced in the contract are not
appropriate market measures.

Bayer further asserts that there is no evidence in the
record of what the actual market price was during the periods relevant to
calculating damages.  But this case and this contract present rare
circumstances in which proof of the actual market price is not necessary
because damages can be calculated without knowing the actual market price.[21] 
Whatever the price, damages can be calculated by multiplying $27.50 times the
number of shortfall tons.  Knowing the actual market price adds nothing to the
analysis.[22] 
Accordingly, Bayer=s second argument is without merit.[23]








3.  Shortfall Tons

Lastly, Bayer maintains that there is no evidence in the
record to establish the shortfall quantity required to be multiplied by $27.50
per ton in order to reach the $7.5 million in damages found by the jury.[24] 
To the contrary, the calculation appears quite clear.  From the time that Bayer
stopped supplying caustic soda to DX to the time that the contract was
scheduled to end (around November 2001 to December 2003) was about 26 months.[25]

26 (months in breach) x 11,250
(monthly minimum tonnage) x $27.50 (discount per ton) = $8,043,750








While
there is a difference between this figure and the jury finding, the UCC (and
the charge) permits a buyer to recover damages less any amounts saved as a
result of the seller=s breach.  Bayer does not suggest that DX
did not save any expenses because of the contract cancellation.  It is also
possible that the jury took into consideration the fact that DX had not always
taken required minimums during the course of the contract.  Accordingly, the jury
may have lessened the number of shortfall tons in its calculations and, thus,
reduced the ultimate amount of damages awarded for Bayer=s failure to
perform.  Furthermore, exact damages figures for breaches of high dollar
commercial contracts are rarely possible and are not required.  See, e.g.,
Vela, 203 S.W.3d at 51 (affirming damages award within range of evidence
where jury could have discounted expert=s sum based on
other evidence); Howell Crude Oil, 928 S.W.2d at 108 (affirming damages
award within range of evidence even though the specific calculation was
inexplicable); see also Bowen, 2006 WL 2192792, at *8 (stating that lost
profits do not have to be proven by an exact calculation).  Accordingly, Bayer=s third argument
is without merit.  Because we find that there was sufficient evidence to
support the jury=s damages award to DX, we overrule Bayer=s seventh issue.

B.  Harmless

Because the jury=s damages finding
is supported by the $27.50 calculation, any error alleged in Bayer=s fifth and sixth
issues would be harmless.  In its fifth issue, Bayer contends that the trial
court erred in admitting the testimony of DX=s damages expert
because his testimony was based on improper methodology and improper
foundation.  The admission and exclusion of evidence are within the sound
discretion of the trial court.  City of Brownsville v. Alvarado, 897
S.W.2d 750, 753 (Tex. 1995).  The complaining party must show that the trial
court erred and that such error probably resulted in an improper judgment,
which usually requires a showing that the judgment turned on the challenged
evidence.  Id. at 753‑54; Prestige Ford Co. Ltd. P=ship v. Gilmore, 56 S.W.3d 73, 78
(Tex. App.CHouston [14th Dist.] 2001, pet. denied); see also Tex. R. App.
P. 44.1(1)(a) (requiring
that before a judgment can be reversed on appeal it must be determined that the
error probably caused rendition of an improper judgment or prevented the
appellant from properly presenting the case on appeal).  Because the
jury=s damages award is
supported by a calculation and related evidence not specifically relied upon by
DX=s expert, it
cannot be shown that the ensuing judgment turned on the expert=s testimony.  See
Fairmont Supply Co. v. Hooks Indus., Inc., 177 S.W.3d 529, 531-32 (Tex.
App.CHouston [1st
Dist.] 2005, pet. denied) (holding that possibly erroneous admission of expert
testimony on lost profit damages was harmless where other unobjected-to
testimony supported jury=s lost profits award).  Accordingly, we
overrule Bayer=s fifth issue.








In its sixth issue, Bayer contends that the trial court
erred in awarding lost profits damages because such damages were precluded by
the contract and applicable law.  However, it does not appear that the jury or
the trial court necessarily awarded any amount for lost profits.  As noted
above, the charge on damages did not require the jury to calculate lost profits
damages.[26] 
The jury may have simply calculated damages based on the non-cover, market
price calculation using the $27.50 contract discount without calculating lost
profits damages.  Indeed, as explained above, the resulting damages figure is
sufficiently similar to the amount awarded by the jury eliminating any lost
profits.  Therefore, this record does not support Bayer=s assertions that
(1) the trial court erred in awarding lost profits damages, or (2) any such
error probably caused the rendition of an improper judgment.  See Tex. R. App. P. 44.1(1)(a). 
Accordingly, we overrule Bayer=s sixth issue.

VII.  Cross-Appeal

In its cross-appeal, DX contends that the trial court erred
in calculating prejudgment interest and in ordering each side to pay its own
costs.  We consider each issue in turn.

A.  Prejudgment Interest

In the judgment, the trial court awarded prejudgment
interest to DX beginning December 31, 2003 (the last day that the contract was
to have been in force) and running to the date that the jury returned its
verdict.  In its first issue, DX makes two specific arguments regarding this
award:  (1) the trial court should have begun its calculation of prejudgment
interest on the full amount of damages beginning on September 11, 2001, the
date on which Bayer cancelled the contract; and (2) in the alternative, the
trial court should have calculated prejudgment interest on a prorated basis
from the date of cancellation.








The parties agree that Pennsylvania substantive law
controls this issue.  The very purpose of awarding a party prejudgment interest
is to compensate that party for the loss of use of money.  See Benefit Trust
Life Ins. Co. v. Union Nat=l Bank of
Pittsburg, 776 F.2d 1174, 1178-79 (3d Cir. 1985) (discussing Pennsylvania law); Schleeter
v. Intrieri, 473 A.2d 1067, 1068-69 (Pa. Super. Ct. 1984) (AInterest is the
compensation allowed by law or fixed by contract for the deprivation of the use
of money.  When there is no such deprivation, no interest can be awarded.@); Restatement (Second) of Contracts ' 354, cmt. a
(1981) (AHad the
performance been rendered when it was due, the injured party would have been
able to make use of it.  Interest is a standardized form of compensation to the
injured party for the loss of that use . . . .@).[27] 
It is not intended as a punitive measure.  See Benefit Trust Life, 776
F.2d  at 1178.  Therefore, prejudgment interest in contract cases must be
calculated only from the time performance becomes due.  See, e.g., Somerset
Cmty. Hosp. v. Allan B. Mitchell & Assocs., 685 A.2d 141, 148-49 (Pa.
Super. Ct. 1996); Restatement (Second)
of Contracts ' 354(1) & cmt. a.  To begin calculating
interest from a prior point would overcompensate the injured party, or stated
another way, it would give the party a remedy (interest) before there was any
harm (loss of use of money or performance).  Here, although DX is correct that
the jury apparently found that Bayer breached the contract when it cancelled
the contract in September 11, 2001, DX did not begin to incur actual damages
until Bayer stopped making required deliveries of caustic soda, apparently
sometime in November or December 2001.  Even then, DX was harmed only to the
extent that Bayer failed to deliver the amount due for that month.  The damages
were then incurred month-to-month, and the loss of use of money (or
performance), for which prejudgment interest is designed to compensate, only
occurred from month-to-month and not all at once in September 2001.  Thus, the
trial court did not err in refusing to award prejudgment interest on the full
amount of damages beginning in September 2001.








As an alternative argument, DX asserts that the trial court
should have calculated prejudgment interest on a prorated basis.  Bayer
initially contends that DX waived this argument by failing to sufficiently
bring it to the trial court=s attention.  In order to preserve an
issue for appellate review, the record must demonstrate that the issue was
brought to the trial court=s attention by a timely and sufficiently
specific request, objection, or motion.  Tex.
R. App. P. 33.1(a)(1).  The record must also demonstrate that the trial
court ruled on the request, objection, or motion, either expressly or
implicitly, or if the court refused to make a ruling, that the requesting party
objected to such refusal.  Id. 33.1(a)(2).

In its Motion for Judgment on the Verdict, DX requested
only prejudgment interest calculated from the date of cancellation in September
2001.  DX did not mention the possibility of prorating prejudgment interest. 
In DX=s subsequent
response to Bayer=s objections to the motion, DX again
mentions only the calculation beginning in September.  At the hearing on the
entry of judgment, DX=s counsel stated to the trial court as
follows:

The judgement [sic] we submitted
will start with September 2, 2001, and applied [sic] the 6 percent interest to
the 7 and a half million damages from that point. . . .  We have, if the Court
has any interest in seeing it, an alternative calculation of prejudgment
interest that divides the post-termination amount equally and runs it month by
month. . . .  Take the amount of damages over however months [sic] it has and
figure an equal amount for each month and just begin accruing from each month
as they pass in effect.  If the Court wants to see it.  That really is the
question.

Counsel
then went on to argue that the correct calculation was from September 2001 and
moved for entry of judgment in the form submitted, with interest running from
September 2001 on the full amount.








In its final judgment, the trial court appears to have
lined out the amount of interest as supplied by DX in the draftCrunning on the
full amount of damages from September 2001Cand written in an
amount of interest calculated from the final day that the contract was to have
been in place, as urged by Bayer.  DX does not point to any other place in the
record where it presented the prorated calculation to the trial court.  It was
presented neither in DX=s response to Bayer=s Motion for New
Trial nor at the hearing on that motion, and DX did not file any post-judgment
motions.  We find that DX=s brief mention of the alternative
calculation was not sufficient to preserve this issue for appeal, particularly
given DX=s failure to
actually make a request, objection, or motion based on the alternative
calculation, and the trial court=s failure to make
an express ruling on such calculation.[28] 
See Tex. R. App. P. 33.1(a). 
Accordingly, we overrule DX=s first issue.

B.  Costs

In its second issue, DX contends that the trial court erred
in ordering each side to pay its own costs.  Generally, the successful party to
a suit shall recover all costs from the opposing party.  Tex. R. Civ. P. 131; 303.  A Asuccessful party@ under the rules
is one that obtains a judgment vindicating a civil right.  E.g., Perezl v.
Baker Packers, 694 S.W.2d 138, 143 (Tex. App.CHouston [14th
Dist.] 1985, writ ref=d n.r.e.).  Notwithstanding the general
rule, a trial court may, for good cause shown, otherwise award costs.  Tex. R. Civ. P. 141.  AWhen a
counterclaim is pleaded, the party in whose favor final judgment is rendered
shall also recover the costs . . . .@  Tex. R. Civ. P. 303.  We review a trial
court=s allocation of
costs under an abuse of discretion standard.  Univ. of HoustonCClear Lake v.
Marsh, 981 S.W.2d 912, 914 (Tex. App.CHouston [1st
Dist.] 1998, no pet.).

DX contends that it was the successful party, and thus
entitled to costs, because the final judgment awarded it $7,460,000 plus pre-
and post-judgment interest.  Bayer contends, however, that it, too, was a
successful party in the litigation because the jury awarded it $40,000 for DX=s breach of
contract (which the trial court offset against DX=s recovery in the
judgment), and because it prevailed on DX=s claim for
tortious interference.








Texas appellate courts have not been entirely consistent in
reviewing trial courts= splitting of costs between opposing
parties, particularly when claims and counterclaims are involved.  Some courts
have held that the party receiving the larger recovery is entitled to costs.  Chilton
Ins. Co. v. Pate & Pate Enters., Inc., 930 S.W.2d 877, 895 (Tex. App.CSan Antonio 1996,
writ denied); Rio Grand Valley Sugar Growers, Inc., 580 S.W.2d 850, 866
(Tex. Civ. App.CCorpus Christi), rev=d on other grounds, 592 S.W.2d 340
(Tex. 1979); Willingham v. Hagerty, 553 S.W.2d 137, 139-40  (Tex. Civ.
App.CAmarillo 1977, no
writ).  Other courts have held that when both sides successfully prosecute
their claims, a trial court can in its discretion split costs between the
parties.  Niemeyer v. Tana Oil & Gas Corp., 39 S.W.3d 380, 389-90
(Tex. App.CAustin 2001, pet. denied); Building Concepts, Inc.
v. Duncan, 667 S.W.2d 897, 905-06 (Tex. App.CHouston [14th
Dist.] 1984, writ ref=d n.r.e.); see also Mobil Producing
Tex. & New Mexico, Inc. v. Cantor, 93 S.W.3d 916, 920 (Tex. App.CCorpus Christi
2002, no pet.) (AA trial court does not abuse its
discretion in taxing costs against both sides where neither party was wholly
successful in that one expected to receive more while the other expected to pay
less.@); Okon v. Levy,
612 S.W.2d 938, 943‑44 (Tex. Civ. App.CDallas 1981, writ
ref=d n.r.e.) (same).[29]

Other than citing to Rules 131 and 303 and the Chilton
Insurance case, DX offers no reasoning as to why we should abandon or
distinguish our prior holding in Building Concepts.[30] 
Accordingly, we follow our established precedent and overrule DX=s second issue.

We affirm the trial court=s judgment.

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

Judgment rendered
and Opinion filed December 12, 2006.

Panel consists of
Chief Justice Hedges and Justices Yates and Seymore.









[1]  This section of the opinion presents general
background information regarding the parties=
relationship and significant events leading to the present litigation.  More
detailed facts are included where relevant in the substantive discussion that
follows.





[2]  Although the contract provided that if the price
calculation fell below zero, Bayer would not have to pay DX to take caustic soda,
there is no indication in the record that this possibility ever occurred.





[3]  When parties have contractually chosen the law of
another state to govern disputes, matters of remedy and procedure are still
governed by Texas law in Texas courts.  E.g., In re Wells Fargo Bank Minn.
N.A., 115 S.W.3d 600, 605 n.7 (Tex. App.CHouston
[14th Dist.] 2003, orig. proceeding).





[4]  Although the parties agree that Pennsylvania law
governs the dispute, both sides cite case law from Texas and other
jurisdictions interpreting the UCC.  Under Pennsylvania law, opinions from
other jurisdictions interpreting the UCC are considered persuasive if they
involve provisions that are substantially similar to the relevant Pennsylvania
UCC provisions.  Cont=l Ins.
Co. v. Schneider, Inc., 873 A.2d
1286, 1293 n. 10 (Pa. 2005).  Neither side has identified any distinctions
between the Pennsylvania UCC and the UCC versions in the other cited
jurisdictions.





[5]  The Pennsylvania Supreme Court has stated that when
the parties to a contract agree that the goods will be delivered in equal
installments, the buyer is generally obligated to take at least the minimum
quantity.  See Diamond Alkali Co. v. Aetna Explosives Co., 107 A. 711,
712 (Pa. 1919). 





[6]  Bayer states that DX=s industry experts, Jack Clinton and John Hanson, concluded that DX=s failure to take target minimums in May through
August of 2001 substantially impaired the value of the contract to Bayer.  This
assertion is not completely justified based on the actual testimony.  Jack
Clinton agreed to the general propositions that if Bayer exceeded its storage
capacity it would be problematic and that selling excess caustic soda on the
spot market could be troublesome for Bayer.  He further agreed that the
principal value of the contract to Bayer was dependable removal of caustic
soda.  The following exchange then occurred:

 

Q.     [I]f the buyer has lost the outlet for 40 to 50
percent of the product it has to take away and hadn=t replaced it for four months since that outlet said
that we are going for good, Bayer had lost the value of this contract, hadn=t it?

 

A.     Bayer has a problem with its contract.

 

Q.     They have lost the value of the contract to
them because the value of the contract is taken awayCthe excess caustic, right?

 

A.     That was their plant, yes.

 

Clinton=s testimony, however, does not have to be read as
concluding that DX=s conduct substantially impaired the value of the
whole contract to Bayer.  Clinton was asked a hypothetical regarding a 40-50%
drop in orders for four months, but the evidence only showed about a 38% drop
in orders for the four month period.  The hypothetical also does not take into
account that (as discussed in the text following this footnote) there was
evidence Bayer=s inventory levels did not threaten a shutdown and
Bayer had an outlet through its sales to Davison.

John Hanson testified that the value of the contract
to Bayer was for DX to take the caustic soda away and that Bayer had limited
inventory capacity.  Hanson was then asked a hypothetical as follows: Aif the inventory situation had built up such that this
company had lost its biggest customer and was not even coming close to ordering
the minimum and the inventories were to the point where they were looking at
that plant shut down, Bayer had lost a substantial value of this contract, hadn=t they?@ 
To this question, Hanson gave a qualified Ayes.@  However, just as with Clinton=s testimony, the offered hypothetical assumed a
dangerous inventory level, regarding which the evidence was hotly contested. 
It is also worth mentioning that neither Clinton nor Hanson was asked whether
DX=s conduct substantially impaired the value of the whole
contract; it is therefore unclear whether their responses to the hypotheticals
suggested substantial impairment to the individual installments or the whole
contract.

Furthermore, even if Clinton and Hanson=s testimony can be read as concluding that DX=s conduct substantially impaired the value of the
whole contract to Bayer, this would still not render the evidence conclusive in
this regard.  As is discussed in the text, DX offered significant evidence that
its conduct did not substantially impair the value of the whole contract to
Bayer.





[7]  Bayer points out that the contract called for
specific amounts to be shipped via particular methods and that Davison was DX=s only barge customer.  Thus, when DX lost Davison as
a customer, DX had difficulty taking the specified amounts by barge.  Although
relevant, these facts do not refute the evidence that Bayer rejected numerous DX orders and failed to
deliver required amounts on several occasions.





[8]  One particular internal email from Aleta Richards, head of Bayer=s marketing group which oversaw
caustic soda sales, is illustrative: A[L]et=s not schedule/arrange barges for
DX. . . . [E]very pound that he cannot take during a given month, is more
material that we will be able to reroute to Davison and others.@

It should be noted that
Bayer also produced evidence in the form of correspondence with DX showing
Bayer=s complaints about earlier,
pre-2001 shortfalls.  However, DX=s evidence suggest that Bayer=s letters may have been mere subterfuge and would
not be particularly relevant to the 2001 shortfalls.





[9]  The fact that Bayer had other outlets for caustic
soda would not by itself prove that DX=s
conduct had not substantially impaired the value of the contract to Bayer. 
However, such evidence casts doubt on Bayer=s
assertion that it was facing an imminent inventory crises in the summer of
2001.





[10]  Bayer cites several other cases in support of the
proposition that substantial impairment can be proven as a matter of law;
however, each of these additional citations is not only distinguishable but
also of less value to the current analysis than either L&M Enterprises or
Design Plus Store
Fixtures.  See Mustang Pipeline
Co. v. Driver Pipeline Co., 134 S.W.3d 195 (Tex. 2004) (not an installment
contract or Asubstantial impairment@ case); Am. Tube & Stamping Co. v. Erie Iron & Steel Co.,
125 A. 304 (Pa. 1924) (not a UCC case); United Trading & Shipping, Inc.
v. Commonwealth Ins. Co., Civ. A. No. 94-4742, 1999 WL 712585 (E.D. Pa.
Sept. 10, 1999) (unreported case); Hooker v. Nguyen, No. 14-04-00238-CV,
2005 WL 2675018 (Tex. App.CHouston [14th
Dist.] Oct. 20, 2005, pet. denied) (memo. op.) (not an installment contract or Asubstantial impairment@ case); Mold-Tech USA, LLC v. Holley Performance Prods., Inc.,
No. E2004-01938-COA-R3-CV, 2005 WL 2051289 (Tenn. Ct. App. Aug. 26, 2005)
(unreported case).





[11]  The legal doctrine of substantial performance
generally permits a party to a contract that breaches nonmaterial terms (but
has otherwise substantially performed) to sue the other party to the contract
for breach.  Patel v. Ambassador Drycleaning Co., 86 S. W.3d 304, 306
(Tex. App.CEastland 2002, no pet.).





[12]  In Midwest Mobile, the court stated that
substantial impairment of an individual installment (under UCC section
2612(b)) may be judged by reference to the concept of material breach under
traditional contract law.  965 F. Supp. at 1013.  However, in analyzing
substantial impairment of the whole contract (under UCC section
2612(c)), the court referenced only the requirements under the UCC and did not
reference traditional material breach principles.  Id. at 1015-16.  The
clear implication is that a showing of substantial impairment of the value of
the whole contract requires more than a mere showing of material breach of one
or more installments.





[13]  During the hearing on entry of judgment, the trial
judge seemed to suggest that the substantial impairment sentence in the charge
merely directs the jury that if they find substantial impairment of the value
of the whole contract then they must find a breach of contract.  He went on to
suggest that a finding of material breach does not necessarily translate to a
finding of substantial impairment of the whole.  This is a logical reading of
the charge language in context, comporting with the trial court=s ultimate decision not to disregard the finding of
Bayer=s failure to comply based on the same arguments Bayer
now makes on appeal.





[14]  Interestingly, Bayer=s own proposed charge clearly differentiates the discussion of trivial
nonperformance and substantial performance from that regarding substantial
impairment of value, stating that a breach of one installment does not equate
to a breach of the entire contract and entitles the nonbreaching party only to
damages relating to that installment.





[15]  It is likely, but not clear from the record, that
the trial court held an earlier, less formal charge conference during which the
final charge was drafted and possibly agreed upon.  When the jury sent out the
question at issue in this appeal, the judge told counsel that he had submitted Aall the instructions you wanted.@  Then, when Bayer proposed a specific supplemental
instruction, the judge stated that the instruction looked like one that had
been proposed earlier, but Awe chose to go
a different way with this.@





[16]  It is impossible to determine the exact timing of
the jury questions and the discussions thereof from this record.  The judge
responded to the cancellation query before the end of the day on February 23,
but it is uncertain  at what time of day the notes were sent out or the judge
responded.  The judge stated on February 24 that the two additional requests
(for the exhibits and a highlighter) had been sent out at the end of the
previous day.  Beyond the fact that it was February 24 (the next day), there is
no indication in the record as to when the additional requests (and Bayer=s proposed written instructions) were discussed by the
judge and counsel.  Bayer asserts that the discussion occurred Athe very next morning,@ but neither it nor the record offers a more exact time.





[17]  By urging the court to respond Ano@ to the jury=s query, Bayer=s
counsel may have been alluding to the argument that Bayer had proven that the
breach was justified as a matter of law.  However, as we held above, Bayer
failed to prove that cancellation was justified as a matter of law.





[18]  A buyer may only recovery consequential damages,
however, to the extent that such damages could not be reasonably prevented by
cover.  Pa. Cons. Stat. ' 2715(b)(1), cmt. 3; Toshiba Mach. Co., Am. v. SPM
Flow Control, Inc., 180 S.W.3d 761, 781 (Tex. App.CFort Worth 2005, pet. granted, judgm=t vacated w.r.m.).





[19]  Furthermore, it is unclear that the jury awarded any
amount for lost profits.  Bayer spends considerable time in its brief
discounting the evidence of lost profits; the jury may well have agreed and not
awarded lost profits.





[20]  She explained that through the discount, Bayer was
basically paying DX to handle the logistics of removing the caustic soda from
Bayer=s facility.





[21]  Furthermore, the record does contain the CMAI
Chlor-Alkali Market Reports for February 1, 1999, through May 28, 2004 (issues
56 through 120 with supplements).





[22]  It should be noted that the contract does allow for
the possibility that one of the methods for calculating DX=s price could result in a value of less than zero.  In
that case, Bayer would not have been required to pay DX to take delivery and DX
would not have been required to take delivery.  However, there is no suggestion
in the record that the price of caustic soda ever got that low during the life
of the contract.





[23]  Although the charge as submitted did not require the
jury to calculate damages based on cover to the extent cover was obtained, the
$27.50 figure in the contract could also have been used in determining cover
damages.  Cover damages are calculated as the difference between the cost of
cover and the contract price (together with any incidental or consequential
damages and minus expenses saved).  Pa.
Cons. Stat. ' 2712.  As stated above, the UCC presumes that cover
is proper and that it sets the market price.  Dura-Wood Treating, 675
F.2d at 753; Kiser, 536 S.W.2d at 589.  The contract essentially
guarantees DX a discount of $27.50 off market price, and even includes a method
of calculating market price based on the average price DX paid for non-Bayer
caustic soda for any given month.  Thus, it would have been reasonable for the
jury to calculate all of DX=s damages for
shortfalls at $27.50 per ton, regardless of whether those damages were cover
damages under section 2712 or non-cover damages under section 2713.

Additionally, Bayer suggests that DX had
the opportunity to obtain reasonable substitute caustic soda at below market
price.  Even if this were true, the contract provides that DX was entitled to
$27.50 off  the lowest of three price determinants, including DX=s average purchase price of non-Bayer material.  Thus,
even if DX could have obtained caustic soda below the published market price, it
was still entitled to a $27.50 discount from Bayer.  Indeed, DX=s president, Karm, testified to this exact point.





[24]  The jury did not necessarily find that Bayer
committed any breach prior to cancelling the contract; thus, the entire $7.5
million in damages it awarded to DX may have been for post-cancellation
breach.  In fact, Bayer strenuously argues that it committed no breach prior to
cancellation.





[25]  Exact times and amounts are difficult to deduce on
this record.  Bayer cancelled the contract effective November 1, 2001.  A chart
prepared and introduced by Bayer purports to show a summary of amounts
delivered through October 2001 and nothing thereafter.  DX states in its brief
that there were only 25 months of absolute nonperformance.  An exact figure for
the shortfall tons is neither possible nor necessary, and a variation of one
month of deliveries or so does not alter our analysis.





[26]  Additionally, Bayer has strenuously argued that
there was insufficient evidence of lost profits damages to support such an
award.





[27]  Pennsylvania has adopted the Restatement regarding
prejudgment interest in contract cases.  See Penneys v. Pa. R.R..Co., 183 A.2d 544, 546 (Pa. 1962); see
also Benefit Trust Life, 776 F.2d at 1178-79 (discussing Penneys and other Pennsylvania cases).





[28]  Regarding the propriety of a prorated calculation of
prejudgment interest in relation to an installment contract, see generally, Restatement
(Second) of Contracts ' 354, illus. 7.





[29]  In Okon, the court examined the record
to determine if the trial court stated its reasons for splitting costs in the
record, whereas in Mobil Producing, the court did not consider
whether the trial court stated its reasoning.  Mobil Producing, 93
S.W.3d at 920; Okon, 612 S.W.2d at 944.  Rule 141 permits a trial court
to otherwise adjudge costs Afor good cause,
to be stated on the record.@  However,
neither Okon nor Mobil Producing involved counterclaims, which
are specifically treated in Rule 303.





[30]  In Building Concepts, we noted that AIt is clear from the record that the judge assessed
the costs as he did because both parties successfully prosecuted their
claims.@  667 S.W.2d at 905-06 (emphasis in original).  The
same is true here.